UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

RIVER CROSS LAND COMPANY, LLC, a
Florida limited liability company,

                Plaintiff,                CASE NO.: 6:18-cv-1646-ORL-22-KRS

v.

SEMINOLE COUNTY,  a political
subdivision of the State of Florida,

                Defendant.
_____/

## DEFENDANT, SEMINOLE COUNTY'S MOTION TO DISMISS AND ALTERNATIVE MOTION TO STRIKE

Defendant, Seminole County (the "County"), by and through its undersigned attorneys and pursuant to Rules 12(b)(6), 12(b)(1), and 12(f) of the Federal Rules of Civil Procedure, hereby moves this Honorable Court to dismiss the Complaint dated October 2, 2018, filed by Plaintiff, River Cross Land Company, LLC (the "Developer" or "River Cross"), and strike Paragraph 10 of the Complaint and, in support thereof, states as follows:

### Preliminary Statement

In the instant case, Plaintiff, a non-minority developer, using the Fair Housing Act ("FHA") 42 U.S.C. § 3601, *et seq.*, is prematurely challenging Seminole County's Comprehensive Plan Rural Boundary Line and Comprehensive Future Land Use Amendment to get its proposed private mixed-use development, known as the River Cross Project, built in an undeveloped area.  Plaintiff relies upon the Seminole County Board of County

Commissioners' decision that Plaintiff's application to change the County's Comprehensive Plan and Future Land Use Amendment was incomplete as the entire basis of this action.

Plaintiff's claims fail for the following independent reasons:

1. Plaintiff lacks standing to bring this FHA claim against the County.

2. Plaintiff's claim is not ripe.

3. Plaintiff has failed to plead the necessary facts to state a claim. Specifically, Plaintiff has not adequately alleged disparate impact and causation, which are required to proceed with a claim under the FHA.

4. Plaintiff's claims for injunctive relief are barred.

**<u>Statement of Relevant Facts</u>**

Seminole County's approximately 220,000 acres, like many Florida counties, is made up of denser urban pockets and less dense rural areas. The Econlockhatchee River ("Econ River") acts as the current rural boundary where the land east of the Econ River is predominately rural, and the western acreage is predominately urban and contains most of the County's cities such as Lake Mary and Sanford. *See* Complaint ¶ 5. This is by design; Seminole County's Board of County Commissioners understands the necessity for responsible growth to prevent urban sprawl. *Id.*

In 1991, the Board of County Commissioners created the East Rural Area of Seminole County when it adopted the 1991 Seminole County Comprehensive Plan Update. *See* Transcript of Seminole County Board of County Commissioners Meeting, held at 1:30 p.m.,

on August 14, 2018, (the "Board Transcript")[1], attached as **Exhibit "A"** p. 39. This was done as a planning technique "to protect the character of the area as agricultural and rural residential," and as a business decision to ensure the cost-effective provision of public services and to discourage urban sprawl and limit urban uses to eliminate the need for significant investments in capital improvements. *Id.*

In 2004, the voters of Seminole County amended the Seminole County Home Rule Charter, originally established in 1989, to establish a Rural Boundary and a Rural Area. Article V, Section 5.2, Seminole County Home Rule Charter, attached as **Exhibit "B."** The County focused its planning policy on maximizing the development potential in the urban area, which would create compact land use patterns that discouraged urban sprawl and decreased automobile trips. Board Transcript p. 41.

On May 1, 2018, Plaintiff applied to develop approximately 670 acres of real property (the "Property") located in the East Rural Area consisting of 600 single-family residential lots, 270 townhome lots, 500 multi-family units and 1.5 million square feet of commercial uses (the "Mixed-use Development"). Complaint ¶ 11. To develop the Mixed-use Development, Plaintiff applied to Seminole County for amendment to its Comprehensive Plan to amend the Rural Boundary Line to remove the Property from the East Rural Area, to amend the County's Future Land Use Map to also remove the Property from the Rural Boundary Line and to rezone the Property. Complaint ¶ 12. The application, of course, required a thorough plan because the Mixed-use Development falls within the East Rural Area, and is otherwise completely

---

[1] As discussed, *infra*, portions of this Motion are made pursuant to Rule 12(b)(1), *Federal Rules of Civil Procedure*, and, as such, the court may consider, on these issues, extrinsic evidence outside the four corners of the Complaint. *See Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009).

undeveloped and outside Seminole County's existing utility area. Board Transcript p. 36. Plaintiff's application went through one review cycle with the Development Review Committee ("DRC") and Plaintiff chose not to respond to the DRC comments or resubmit. Board Transcript p. 37. Instead, Plaintiff went to the Planning and Zoning Commission, who determined the application was incomplete. *Id.* Finally, the Board of County Commissioners also determined that Plaintiff's application was incomplete and incompatible with other development for the area[2]. *Id.* at 122.

While the Complaint alleges, "Plaintiff guaranteed that at least 15% of the residential real estate in the River Cross Project would be designated as affordable housing," Developer's submission stated that Developer would be applying for Florida Housing Finance Corporation funding and if they did not receive that funding, all designated affordable units would revert to market rate units. Board Transcript p. 120. Therefore, the commitment in the Development Order to provide 15% affordable housing is not a guarantee to provide a specific percentage of affordable units – in fact, it does not guarantee *any* affordable units. *See also* Board Transcript p. 35 ("however the proposed development order and master plan have no provisions or commitments to ensure the development of affordable units, nor do the documents specify what income level would be served.").

---

[2] Board Transcript p. 122, "Commissioner Dallari stated in going through the submittal, hearing the testimony, and basing his decision on the evidence presented today, he feels the application is incomplete and he would like to make a motion." *See also* Board Transcript p. 36-37, "such analysis, as outlined in the staff report, was not provided with the application," "Application does not demonstrate these three conditions have been met," "application did not adequately address how the needed transportation improvements to support the proposed development would be funded or constructed," "the report is incomplete." These are just several examples of the multiple times the Board references the incompleteness of River Cross's application. Further, other than being incomplete, the Application was inconsistent with the Comprehensive Plan and Land Development Code, and incompatible with the trend of development in the area. *See* Board Transcript p. 38-39.

Typically, a final denial by the Board of County Commissioners could be appealed to a Florida Circuit Court for review under the "fairly debatable test." *Coastal Dev. of N. Fla., Inc. v. City of Jacksonville Beach*, 788 So. 2d 204, 205 (Fla. 2001) (holding that small-scale comprehensive plan amendments are legislative in nature and subject to the "fairly debatable standard," which is a highly deferential standard requiring approval of land use planning action if reasonable persons could differ as to its propriety); *City Envtl. Servs. Landfill, Inc. of Fla. v. Holmes Cty.*, 677 So. 2d 1327, 1332 (Fla. 1st DCA 1996) (holding that denial of a proposed amendment to comprehensive land use plan was legislative action). Developer, however, prior to obtaining a decision on the merits by the Board of County Commissioners, did not bring a suit in the appropriate Florida Circuit Court, and attempts instead to use the FHA as a "hook" for federal jurisdiction. The decision that Developer appeals, however, is not the final step in the process to amend the Comprehensive Plan.

Even if the Board of County Commissioners had approved Plaintiff's transmittal, the project would still remain in the early stages of final approval. First, pursuant to Section 163.3184(3) Florida Statutes, the decision would be reviewed and commented upon by the Florida Department of Economic Opportunity and the Board of County Commissioners would hold a *second* public hearing. Board Transcript p. 33. If the project was again approved, any aggrieved party would have an opportunity to file a petition for a formal hearing with the Florida Division of Administrative Hearings. *Id.*

Seminole County's Comprehensive Plan and Land Development Code are designed to keep the rural property in Seminole County rural and designed to "maximiz[e] the development potential in the urban area . . . ." *See* Board Transcript p. 41; *see generally* Board Transcript p.

39-41. Seminole County's denial of Developer's incomplete application to amend the Comprehensive Plan and to develop the Mixed-use Development in order "to preserve the rural character of the area" has led Plaintiff to file this lawsuit. *Id.* at 40.

## Legal Authority

### I. Standards

#### a. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a claim based on a plaintiff's "failure to state a claim upon which relief can be granted." "A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief . . . ." Fed. R. Civ. P. 8(a)(2). "[D]etailed factual allegations" are not required, but "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). Facial plausibility requires the plaintiff to plead facts that allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). Thus, the Court is not required to accept as true a legal conclusion merely because it is labeled a "factual allegation" in the complaint; it must also meet the threshold inquiry of facial plausibility. *Id.*

#### b. 12(b)(1)

Standing and ripeness go to this Court's subject matter jurisdiction. *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1232 (11th Cir. 2008) (per curiam). The party "invoking federal jurisdiction bears the burden of establishing" standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Questions of subject matter jurisdiction are addressed under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Attacks on the factual underpinnings of jurisdiction allow a court to "consider extrinsic evidence" rather than solely taking the complaint's allegations as true. *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009); *Core Construction Services Southeast, Inc. v. Crum & Forster Specialty Insurance Co.*, No. 6:14-cv-1789-Orl-31KRS, 2015 WL 3929696, *1 (M.D. Fla. June 25, 2015) (a court "may look outside of the pleadings . . . to the factual circumstances" when determining ripeness) (citing *Strickland v. Aldeman*, 74 F. 3d 260, 266 (11th Cir. 1996)). With factual attacks, "the burden is on the plaintiff to prove that jurisdiction exists." *Gibbs v. United States*, 865 F. Supp. 2d 1127, 1135 (S.D. Fla. 2012) (quoting *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002)).

II. **Plaintiff Lacks Standing to Assert These FHA Claims Against the County**

The FHA arises out of a governmental concern with protecting the victims of housing discrimination; however, the injuries over which this Developer sues are far from the intent of the statute. Plaintiff, a private company in the business of developing property at all levels of the economic spectrum, asserts standing based on its individual fiscal consequences of the County's long-held rural boundary. This burdensome type of FHA litigation is neither necessary nor appropriate to enforcing the FHA's important anti-discrimination objectives – particularly when this Plaintiff does not guarantee that it will build a single low income housing

unit. To allow Developer to sue in this case would allow too expansive of an approach to standing and would allow non-minority developers (who may not even assist minority residents) to sue over economic injuries that are not derivative of any discrimination against third parties. This Court should find that Plaintiff lacks standing.

While the Supreme Court has said that standing under the FHA is as broad as is permitted by Article III of the Constitution, *see Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 108 (1979), it is not unlimited. *See Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977) (Developer could assert its own rights to be free of arbitrary and irrational zoning decisions, but would not have the right to claim discrimination because a corporation has no racial identity and cannot be the target of discrimination); *Nasser v. City of Homewood*, 671 F.2d 432, 437 (11th Cir. 1982) (finding that the landowner-plaintiffs did not have standing, as they failed to show more than an economic interest affected by the defendant's rezoning decision); *South-Suburban Hous. Ctr. v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868, 880 (7th Cir. 1991) (finding that Realtors did not have standing to pursue FHA claims). This broad standing does not mean that each and every person or entity has standing under the FHA. In fact, no case has ever found standing in this distinguishable context.

FHA standing case law has significantly evolved since *Gladstone Realtors*, which limited the prudential aspects of standing in favor of the FHA statutory boundaries. *Gladstone Realtors,* 441 U.S. at 100. However, the Supreme Court has made it clear that certain aspects that are sometimes thought of as "prudential" are mislabeled, and must be considered in FHA cases. *See Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Bank*

*of America Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1302-03 (2017). The standing question courts must answer is "whether the statute grants the plaintiff the cause of action that he asserts." *Bank of America Corp.,* 137 S. Ct. at 1302. The first consideration courts review in FHA cases is whether a plaintiff comes within the zone of interests. *Id.* at 1302-03. A second consideration is whether a plaintiff may assert the rights of another through its claim. *South-Suburban Hous. Ctr. v. Greater South Suburban Bd. of Realtors*, 935 F.2d 868, 880 (7th Cir. 1991). Here, the answer to both questions is no. Plaintiff does not come within the zone of interests protected under the FHA and has no standing to assert the rights of any third parties.

### a.    Plaintiff Does Not Fall Within the Zone of Interests

A statute only provides a cause of action to "plaintiffs whose interests 'fall within the zone of interests protected by the law invoked.'" *Lexmark Int'l, Inc.*, 572 U.S. at 129 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)). To be considered an "aggrieved person" under the statute, a litigant must fall within the zone of interests protected under the FHA. *Bank of Am. Corp.*, 137 S. Ct. at 1299. The zone of interests test "exclude[s] plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions in [the statute]." *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 177-78 (2011) (applying the zone of interest principle to Title VII actions, which, under 42 U.S.C. § 2000e-5(b), (f)(1), also authorizes aggrieved persons to file an action.).

This Developer is not within the zone of interests protected by the FHA. In enacting the FHA, Congress sought to protect individuals' right to fair housing and to live in integrated communities. It demonstrated no concern with developers' interests in ignoring a County's meaningfully-determined rural boundary to possibly provide a small amount of affordable

housing as an objective of the FHA.  Allowing this FHA litigation to proceed will allow a non-minority owned developer to pursue theories that are at odds with the interest of the minority persons seeking housing, for whom the FHA was enacted.  This unusual attempt to exploit the FHA to support a non-minority developer's economic interests disturbs the important concerns that drove the enactment of the FHA.

"There is no indication that the Court [in *Gladstone*] intended to extend standing . . . to plaintiffs who show no more than an economic interest which is not somehow affected by a racial interest."  *Nasser v. City of Homewood*, 671 F.2d 432, 437–38 (11th Cir. 1982).  Therefore, this Plaintiff's interests and injury must be reviewed before it can establish standing under the FHA. *Id.*

In *Nasser*, landowners brought a suit under the FHA challenging a city's decision to rezone their property from multifamily residential to single-family residential.  The Eleventh Circuit found that the plaintiff lacked standing and held that the plaintiff could not recover purely economic damages under the FHA based upon a diminution in property values.  *Id.*

*Nasser* is not only the law of this Circuit, but is particularly instructive because this Plaintiff seeks economic damages under the FHA based upon a purely economic injury.  This Plaintiff cannot claim any racial interest, particularly when any interest derives solely from the "possible" creation of 100 affordable housing units.  This economic interest that is not affected by a racial interest is insufficient to provide Plaintiff standing to bring this lawsuit.

   **b.**  <u>**Plaintiff Cannot Assert the Rights of Third Parties**</u>

Pursuing a claim based upon the equal protection rights of potential minority affordable housing renters is unavailable for this plaintiff.  "When a person or entity seeks standing to

advance the constitutional rights of others, we ask two questions: first, has the litigant suffered some injury in fact, adequate to satisfy Article III's case-or-controversy requirement; and second, do prudential considerations which we have identified in our prior cases point to permitting the litigant to advance the claim?" *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 623 n.3 (1989). An equal protection claim rests on the legal rights of the affordable housing users for whom the laws were enacted to assist. Therefore, minority home buyers and renters – not wealthy Caucasian developers – may properly bring a fair housing claim.

A developer may only have standing to assert other's claims when the enjoyment of the potential affordable housing user's right is "inextricably bound up with the activity the litigant wishes to pursue." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976). Unless the developer is "as effective a proponent" of the cause, meaning that the priorities are similar and aligned, the developer will lack standing to pursue the suit. *Id.* at 115; *South-Suburban Hous. Ctr.*, 935 F.2d at 880.

In *South Suburban Hous. Ctr.*, the Seventh Circuit found that the Realtors failed to demonstrate a true relationship between their interest in pursuing particular real estate marketing practices and the constitutional rights of specific potential minority home buyers. The Realtors were unable to point to a single minority home buyer who was deprived of his equal protection rights as a result of the marketing plan. Therefore, the relationship between the Realtors and the potential minority home buyers did not reflect the similarity in interest required despite the Realtor's strong philosophical commitment to a housing market in which equal opportunity is realized through color blind marketing. "[T]he courts should not

adjudicate [constitutional] rights unnecessarily, and it may be that in fact the holders of those rights either do not wish to assert them, or will be able to enjoy them regardless of whether the in-court litigant is successful or not." *Singleton*, 428 U.S. at 113–14. Therefore, the Court concluded that the claim rested on the rights of third parties – those seeking homes.

The same is true here. Plaintiff Developer does not have standing to pursue claims for those minority renters or purchasers who possibly would receive housing in the proposed development. The Complaint contains no allegations regarding whether minority persons actually intend to live in the proposed development. Rather, it expects the reader to *infer* that simply by building affordable units, it will change the percentage of minorities in the community. While the inference is suspect for many reasons, the fact that the proposed development will not include *any* affordable units if funding is not ultimately approved by the Florida Housing Finance Corporation, is fatal. The relationship between this Developer and any theoretical minority home renter or purchaser does not reflect the similarity in interest required and would not serve justice.

### III.      This Case Should be Dismissed Because it is not Ripe for Adjudication

Article III of the U.S. Constitution, limiting the jurisdiction of federal courts to actual cases or controversies, requires consideration of whether a plaintiff's claims are ripe for review. *Konikov v. Orange County, Florida*, 410 F.3d 1317, 1322 (11th Cir. 2005) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992)). The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes. "The doctrine seeks to avoid entangling courts in the hazards of premature adjudication," *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997),

and to shield agencies from judicial interference "until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

In deciding the ripeness of a claim, a court inquires into (1) whether the issues are fit for judicial decision, and (2) the hardship to the parties of withholding court consideration. *Digital Properties*, 121 F.3d at 589. Federal courts have applied this two-prong ripeness analysis to claims arising under the Fair Housing Act, which permits enforcement of housing discrimination claims without the need to exhaust the administrative process.

A ripe claim is one in which the injury has been inflicted by an act that is complete and cannot be undone. If a claim is not ripe for review, the court lacks subject matter jurisdiction. A ripe claim is one where a plaintiff can establish that the body "charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 191 (1985). The Board of County Commissioners explicitly denied Plaintiff's application due to it being incomplete. "Decisions on ripeness are fact sensitive" and the court must review the facts leading to the filing of this lawsuit. *Strickland v. Alderman*, 74 F.3d 260, 265 (11th Cir. 1996).

The Complaint details the Plaintiff's application process to Seminole County for an amendment to its Comprehensive Plan to amend the Rural Boundary Line, amend the County's Future Land Use Map, as well as rezone the property at issue. Complaint ¶ 12. As detailed in the Complaint, this application process was first initiated on May 1, 2018. *Id.* The Complaint

details the short three and a half months of meeting with Seminole County, the Development Review Committee, the Planning and Zoning Commission, and the Board of County Commissioners. *Id.* ¶¶ 12-20. The Complaint, however, leaves out the reason for which the Plaintiff's application was denied – the fact that it was incomplete.[3]

A principal aspect of ripeness is finality. Lawsuits based on acts of governmental bodies are not ripe until that body makes a final decision and a court should not review claims based on preliminary or non-final decisions. *See Executive 100, Inc. v. Martin County*, 922 F.2d 1536 (11th Cir. 1991). The County's decision not to transmit a Comprehensive Plan Amendment due to Plaintiff's application being incomplete is not a final decision as to the merits regarding the proposed amendments to the Comprehensive Plan Rural Boundary Line, Future Land Use Amendment, or even the zoning questions. If any individual or developer could gain the right to sue in federal court based on a finding of a deficient application, it would render the requirement of finality meaningless. This would allow any entity to shortcut its way into federal court by providing less than the bare minimum required for the County to make any merit-based decision and bring the dispute straight to the judiciary.

While FHA claims do not require an exhaustion of administrative remedies, the question here, then, is what is required before a developer can bring an FHA claim? While a facially discriminatory law may be challenged prior to determining its application, that is not the standard for this Developer, who alleges disparate-impact, not a facially discriminatory law. To show ripeness under a reasonable accommodation claim, a plaintiff must show that it

---

[3] Board Transcript p. 122 "Commissioner Dallari stated in going through the submittal, hearing the testimony, and basing his decision on the evidence presented today, he feels the application is incomplete and he would like to make a motion."

has afforded the appropriate local authority a reasonable opportunity to consider its request. *Caron Found. of Fla., Inc. v. City of Delray Beach*, 879 F. Supp. 2d 1353, 1365 (S.D. Fla. 2012). In *Caron Foundation*, the court dismissed a claim under the FHA for ripeness because the plaintiff had failed to provide the city with all relevant information requested to evaluate the plaintiff's application for a zoning variance. *Id.* The court noted that the plaintiff failed to show its claim was ripe when the city simply did not have sufficient information to provide the plaintiff its requested zoning variance. Because the plaintiff could have provided that information, the claim was unripe.

A claim is not ripe until all of the underlying facts are certain. Here it is not certain, if Plaintiff went through the application process a standard number of times (which it could have done and still can do after waiting twelve months – *see* Section 30.46, Seminole County Land Development Code) and fixed the incomplete deficiencies in its application, whether the County would deny the development sought. Ignoring this lack of finality would effectively treat the ripeness of this case as if this was a challenge to a facially discriminatory policy, which it is not.

**IV.**      **Plaintiff's Claims Should be Dismissed Because it Fails to Allege Facts Required to Maintain A Disparate Impact Claim**

Lawsuits targeting zoning laws and other housing restrictions claiming unfair exclusion of minorities from certain neighborhoods without sufficient justification are the basis of disparate-impact liability. In contrast to a disparate-treatment case, where discriminatory intent must be shown, disparate-impact claims challenge anything that has a disproportionately adverse effect on minorities and is otherwise unjustified by a legitimate rationale. Although disparate-impact liability under the FHA can counteract unfair prejudice, it has and should be

limited.  *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015).

    a.       **Plaintiff Fails to Adequately Assert Disparate Impact**

*"Inclusive Communities* requires that an FHA disparate impact complaint (1) show statistically-imbalanced [practices] which adversely impact a minority group; (2) identify a facially-neutral policy used by Defendants; (3) allege that such policy was 'artificial, arbitrary, and unnecessary;' and (4) provide factual allegations that meet the 'robust causality requirement' linking the challenged *neutral policy to a specific adverse racial or ethnic disparity."*  *City of Miami v. Wells Fargo & Co.*, No. 13-24508-CIV, 2016 WL 1156882, at *4 (S.D. Fla. Mar. 17, 2016) (emphasis added).

In *Wells Fargo*, the court held that the plaintiffs' contentions that minorities were "targeted" did not allege a facially neutral policy and instead alleged "intentional conduct, which is not a basis for a disparate impact FHA claim under the pleading standards set forth in *Inclusive Communities.*"  *Id.*  Further, plaintiffs did not allege facts demonstrating the policies constituted "artificial, arbitrary, and unnecessary barriers."  *Id.*

The allegations in Plaintiff's Complaint also fail to specify the facially-neutral policy. When closely reviewed, it is not a policy itself about which Plaintiff complains.  Rather, the complaints relate to the County's failure to make an exception for Plaintiff.  Additionally, Plaintiff must allege that the policy itself is "artificial, arbitrary, and unnecessary."  Here, Plaintiff does not allege that the Rural Boundary itself is "artificial, arbitrary, and unnecessary," rather, the Complaint alleges that not providing Plaintiff an exception to the policy (which policy is applied consistently and not arbitrarily), was arbitrary.  *See* Complaint

¶¶ 21, 25.  ("[Defendant's] arbitrary refusal *to approve Plaintiff's proposed amendments . . . .*") (emphasis added).  Therefore, Plaintiff's Complaint fails to meet the requirements specified in *Inclusive Communities*.

### b.       <u>Plaintiff Fails to Adequately Assert Causation</u>

The final element, which Plaintiff does not meet, is the "robust causality requirement" that courts must insist on at the "prima facie stage" linking a defendant's conduct to the racial disparity.  *Inclusive Communities*, 135 S. Ct. at 2523. This robust causality requirement "protect[s] defendants against abusive disparate-impact claims" and ensures that "'[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact'" and thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 2523-24 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k).  "Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and 'would almost inexorably lead' governmental or private entities to use 'numerical quotas,' and serious constitutional questions then could arise. *Id.* at 2523 (quoting *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653 (1989)). Disparate-impact claims must be aimed at "removing artificial, arbitrary, and unnecessary barriers," rather than "displac[ing] valid governmental and private priorities."  *Id*. at 2524. These limitations are necessary to protect defendants against abusive disparate-impact claims.

Causation is the most important pleading element for a disparate-impact claim. A disparate-impact claim that relies on a statistical disparity "must fail if the plaintiff cannot point to a defendant's policy or policies *causing* that disparity." *Id.* at 2523.  (emphasis added).  The

Court must carefully examine whether Plaintiff has made out a prima facie case of disparate impact. Failing to allege *facts* or produce statistical evidence demonstrating a *causal* connection is fatal to a prima facie case. *Wards Cove*, 490 U.S. at 653 (emphasis added). Plaintiff has not even attempted to meet this requirement.

In *Wards Cove*, the plaintiffs based their claim on statistics showing a disproportionately low percentage of minorities in the job positions at issue. *Wards Cove*, 490 U.S. at 657. The Court held that plaintiffs had not made out a prima facie case because they "have to demonstrate that the disparity they complain of is the *result* of one or more of the employment practices that they are attacking here." *Id.* (emphasis added).

The closest Plaintiff's Complaint comes is the statement that the minority population is different on either side of the Rural Boundary. Complaint ¶¶ 8-9. This proportional difference is not an allegation that the Rural Boundary *caused* the disparity and is not sufficient to withstand a motion to dismiss. For example, there is no allegation regarding the population differences prior to the enactment of the Rural Boundary.

The Complaint purposefully fails to address the respective percentage of minority residents before and after the Rural Boundary was adopted, because Plaintiff has not reviewed such information. Instead, the Complaint only relies on statistics that there are more minorities in the urban area than in the rural area, which is not a sufficient showing. *Oviedo Town Ctr. II, L.L.L.P., et al., v. City of Oviedo, Fla.*, No. 6:16-cv-1005-Orl-37GJK, 2017 WL 3621940, at *7 (M.D. Fla. Aug. 23, 2017). In *Oviedo*, the plaintiffs used statistics in an attempt to show a policy change affected racial minorities differently than non-minorities. This Court found, however, that "it reveals only that more racial minorities live in OTC than the rest of Oviedo"

and that "such a statistical disparity is insufficient to impose liability under a disparate impact theory." *Id.*

Similarly to the plaintiffs in *Oviedo*, the only "showing" in Plaintiff's Complaint is that more minorities live in urban areas than rural areas, which is hardly unique to Seminole County. Importantly, it is not a sufficient statistical showing that it is the Rural Boundary that is *causing* housing to be more restrictive for minorities. Based on the lack of statistics regarding the population differences prior to the Rural Boundary, this *only* reveals, as held in *Oviedo*, that more racial minorities live on one side of the Rural Boundary than the other side. *Id.*

Since disparate impact is typically demonstrated by statistics, Plaintiff must plead allegations that, if ultimately proved true, would show a disparate impact. *See Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006). In *Hallmark Developers*, after a trial and on appeal, the 11th Circuit highlighted the guidelines required in the statistical disparity a plaintiff must show. There, a developer challenged a county's denial of a request for rezoning and asserted an FHA disparate-impact claim. *Id.* The court held that any impact must be in regard to the group affected by a decision, which was too speculative. *Id.* There was no evidence that minorities would move into the new development and the "inherently speculative" impact from a new development with no wait-list or evidence of those seeking the housing was not enough to sustain a disparate-impact claim. *Id.* at 1287.

Here, the Complaint contains no allegations about the effect the proposed development would have or about the effect changing or moving the Rural Boundary would have. The lack of any allegation regarding the impact of granting Plaintiff's requested relief is fatal to its disparate-impact claim.

The Complaint's basic allegation that failing to rezone the Property "caused a disparate impact on racial minorities in Seminole County" (Complaint ¶ 29) is exactly the type of conclusory legal assertion couched as fact at which *Twombly* and *Iqbal* take aim and the Court is not required to accept this as true. *See Ng v. HSBC Mortgage Corp.*, No. 07-cv-5434, 2010 WL 889256, *12 (E.D.N.Y. Mar. 10, 2010) (dismissing plaintiff's claim of disparate impact discrimination and finding that the claim was "alleged with little more than buzzwords and conclusory labels").

Because Plaintiff's Complaint lacks any allegation demonstrating a causal connection between the Rural Boundary and any racial disparity, the Complaint must be dismissed.

**V.      Counts II and IV Should be Dismissed Because Injunctive Relief is not Available**

In Counts II and IV of the Complaint, Plaintiff seeks injunctive relief, asking this Court to: (a) amend Seminole County's Comprehensive Plan in accordance with Plaintiff's application; (b) amend Seminole County's Future Land Use Map in accordance with Plaintiff's application; (c) grant Plaintiff's request to rezone the property in accordance with Plaintiff's application; and (d) remove the entire Rural Boundary Line (collectively, the "Rezoning Relief"). *See* Complaint ¶¶ 8-10. As explained below, the Rezoning Relief Plaintiff seeks in this case is improper and this Court should dismiss Counts II and IV.

A comprehensive plan such as the one at issue in this case "is intended to provide for the future use of land, which contemplates a gradual and ordered growth." *Bd. of County Com'rs of Brevard County v. Snyder*, 627 So. 2d 469, 475 (Fla. 1993). A county's established zoning involves more than just a classification – "[a]mong other things it involves the consideration of future growth and development, adequacy of drainage and storm sewers,

public streets, pedestrian walkways, density of population and many other factors which are peculiarly within the legislative competence." *Prestige Homes of Tampa, Inc. v. Hillsborough County*, 220 So. 2d 427, 428 (Fla. 2d DCA 1969) (quoting *City of Miami Beach v. Weiss*, 217 So. 2d 836 (Fla. 1969); *see also Palm Beach County v. Boca Dev. Associates, Ltd.*, 485 So. 2d 449, 452–53 (Fla. 4th DCA 1986) (same).

For these reasons, Florida case law[4] cautions that courts should "tread lightly" when it comes to zoning decisions and "should be highly respectful of the decision of the legislative body which, under the law, is vested with the power and charged with the duty of zoning." *Watson v. Mayflower Prop., Inc.*, 223 So. 2d 368, 373–374 (Fla. 4th DCA 1969), writ discharged, 233 So. 2d 390 (Fla. 1970); *Brevard County v. Woodham*, 223 So. 2d 344, 348 (Fla. 4th DCA 1969). The "ultimate classification of lands under zoning ordinances involves the exercise of the legislative power, preventing the courts under the doctrine of separation of powers from the invasion of this field." *Weiss*, 217 So. 2d at 837–38; *Pasco County v. J. Dico, Inc.*, 343 So. 2d 83, 84 (Fla. 2d DCA 1977) ("The adoption of a zoning ordinance and zoning maps is a legislative act."); *Palm Beach County v. Boca Dev. Associates, Ltd.*, 485 So. 2d 449, 452–53 (Fla. 4th DCA 1986) (explaining that "zoning decisions are primarily 'legislative' in nature and should be made by zoning authorities responsible to their constituents."). It is simply "not the function of the trial court to rezone land" and any judgment ordering a county to rezone land is improper. *Paragon Group, Inc. v. Hoeksema*, 475 So. 2d 244, 246 (Fla. 2d DCA 1985); *see also Lee County v. Morales*, 557 So. 2d 652, 656 (Fla. 2d DCA 1990) ("The

---

[4] Most court reviewed land-use actions are brought in State Court, but federal law is similarly applied. *Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1409 (11th Cir. 1989) ("Under both federal and Florida law, zoning and land use decision-making, such as that presented here, is normally characterized as a legislative function.")

final judgment also erroneously ordered the County to rezone appellees' property and, therefore, violates the separation of powers doctrine."); *Town of Longboat Key v. Kirstein*, 352 So. 2d 924, 925 (Fla. 2d DCA 1977) (finding that a final judgment ordering rezoning violated the separation of powers); *Dade County v. Valdes*, 366 So. 2d 809, 810 (Fla. 3d DCA 1979) (holding that the court order is improper because it directed the county to affix a certain zoning classification to a property); *Metro. Dade County v. McGeary*, 291 So. 2d 28, 29 (Fla. 3d DCA 1974) (reversing a trial court's order requiring rezoning because it "has been held uniformly and repeatedly that the ultimate classification of lands under zoning ordinances involves the exercise of legislative power, a field the invasion of which by the courts is interdicted by the doctrine of separation of powers."); *City of Miami Beach v. Breitbart*, 280 So. 2d 18, 19 (Fla. 3d DCA 1973) (explaining that a court is not permitted to direct a county "that a certain use be allowed for a property" because such an order invades the "legislative field which is prohibited under the doctrine of separation of powers."); *City of S. Miami v. Martin Bros., Inc.*, 222 So. 2d 775, 776 (Fla. 3d DCA 1969) (explaining that, "in choosing a particular liberalized classification and directing the city to so zone the property, the trial court invaded the legislative field, which is prohibited under the doctrine of separation of powers . . . .").

The Rezoning Relief sought by Plaintiffs in this case is strikingly similar to what the court found invalid in *Orange County v. Butler Estates Corp.*, 303 So. 2d 66, 67 (Fla. 4th DCA 1974). In *Orange County* the plaintiff requested (and was granted) injunctive relief ordering the county to rezone the property in accordance with the application plaintiff submitted. *Id*. On appeal, the court reversed the decision, finding that the trial court's ruling requiring the

county "to rezone such property 'in accordance with the (appellees') application' does, indeed, constitute an encroachment upon the exercise of the legislative power of the [county]." *Id.*

Much like *Orange County*, the Plaintiff here demands that this Court enter an Order granting the Rezoning Relief that it outlined in its application to Seminole County. Such an Order would constitute an encroachment upon the County's legislative power. This Court should follow established Florida law and dismiss the overly broad requests for the Rezoning Relief in Counts II and IV of Plaintiff's Complaint.

## <u>Motion to Strike</u>

This Court should strike Paragraph 10 of Plaintiff's Complaint because its inclusion violates Rule 12(f) of the Federal Rules of Civil Procedure, under which the district court may strike from a pleading "any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).[5]

While motions to strike are generally viewed with disfavor, allegations that have no possible relation to the controversy and may cause prejudice to one of the parties are improper and should be stricken. *Seibel v. Soc'y Lease, Inc.*, 969 F. Supp. 713, 715 (M.D. Fla. 1997). In evaluating a motion to strike, the Court must treat all well–pleaded facts as admitted and cannot consider matters beyond the pleadings. *Id.*

Federal courts have previously stricken racially charged material, as it is highly prejudicial. *Alvarado-Morales v. Digital Equipment Corporation*, 843 F. 2d 613, 618 (1st Cir.

---

[5] "'Immaterial' matter is that which has no essential or important relationship to the claim for relief. . ." *Fodor v. E. Shipbuilding Grp.*, No. 5:12-CV-28-RS-CJK, 2014 WL 50783, at *5 (N.D. Fla. Jan. 7, 2014) (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1382 (3d ed. 2004)). "'Impertinent' matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* "Scandalous matter" may be that which reflects cruelly upon a party's moral character, uses repulsive language, or detracts from the dignity of the court. *Id.* (citing *Carone v. Whalen*, 121 F.R.D. 231, 233 (M. D. Pa.1988)).

1988) (granting a motion to strike in a wrongful discharge case on the use of the terms "concentration camp," "brainwashed," and "tortured"); *Bureerong v. Uvawas*, 922 F. Supp. 1450, 1479 (C.D. Cal. 1996) (striking the term "Slave Sweatshop" from a civil complaint as highly prejudicial to the defendants while adding nothing to the material allegations in plaintiff's pleading when plaintiffs could show that defendants had subjected them to involuntary servitude without using that term).

Paragraph 10 of Plaintiff's Complaint is the type of immaterial, impertinent, and prejudicial allegation that a court should strike under Rule 12(f). It reads as follows: "From 1970 until 2006, the Seminole County School District was under a consent decree from the United States ordering the desegregation of the Seminole County school system." This statement is immaterial because the Seminole County School District was and is a separate legal entity from Seminole County, Florida and Seminole County, Florida was not a defendant in the federal litigation, *United States of America v. Seminole County School District, etc., et al.*, Case No. 70-152-ORL-CIV, United States District Court, Middle District of Florida, Orlando Division.

This statement is included to inflame the jury and paint a racially charged picture about Seminole County (that is over 10 years old). "Intent" of the Defendant is not related to the causes of action in the Complaint, which only alleges disparate-impact and not disparate-treatment. This offending statement, while having no relation to the underlying allegations, provides an accusation of intentional racial bias and will undoubtedly improperly prejudice Defendants.

The granting of a motion to strike matter in a pleading is aimed, in part, at avoiding prejudice to a party by preventing a jury from seeing the offensive matter or giving the allegations any other unnecessary notoriety inasmuch as, once filed, pleadings generally are public documents and become generally available. Granting this motion will avoid unnecessary prejudice to the Defendant without prejudicing Plaintiff.

## Conclusion

For the foregoing reasons, the Court should dismiss the Complaint in its entirety. Plaintiff does not have standing to assert these claims under the FHA because Plaintiff is not within the zone of interests and cannot assert the rights of third parties. Further, Plaintiff's claim is not ripe for adjudication. Additionally, Plaintiff has failed to state a cause of action because it has failed to allege disparate impact or causation. Finally, Plaintiff's request for injunctive relief in Counts II and IV of the Complaint is improper and must be dismissed.

Dated: October 24, 2018        Respectfully submitted,

<table>
<tr><td>

*/s/ Shaina Stahl*
**TODD K. NORMAN**
Florida Bar No.:0062154
*Lead Counsel*
**SHAINA STAHL**
Florida Bar No.: 77643
**NELSON MULLINS BROAD AND CASSEL**
390 North Orange Avenue, Suite 1400
Orlando, Florida 33802-4961
Phone: (407)839-4200 / Fax: (407)425 -8377
Todd.norman@nelsonmullins.com
Shaina.stahl@nelsonmullins.com
Angela.gonzalez@nelsonmullins.com
*Attorneys for Defendant Seminole County*

</td><td>

*/s/ Lynn Porter-Carlton*
**A. BRYANT APPLEGATE**
*Seminole County Attorney*
Florida Bar No. 346926
**LYNN PORTER-CARLTON**
*Deputy County Attorney*
Florida Bar No. 0455301
Seminole County Attorney's Office
1101 East 1st Street
Sanford, Florida 32771
Phone: (407)665-7254 / Fax: (407)665-7272
bapplegate@seminolecountyfl.gov
lporter-carlton@seminolecountyfl.gov
dedge@seminolecountyfl.gov
*Attorneys for Defendant Seminole County*

</td></tr>
</table>

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 24th day of October, 2018, I electronically filed the foregoing with the Clerk of the Court pursuant to the Administrative Procedures for Electronic Filing in Civil and Criminal Cases of the Middle District of Florida using the CM/ECF system, which will send a notice of electronic filing to the following counsel of record: Rebecca Rhoden, Esq. Rebecca.rhoden@lowndes-law.com and Michael D. Piccolo, Esq. of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., 215 North Eola Drive, Orlando, Fl 32801 (Counsel for Plaintiff).


/s/ Shaina Stahl
**TODD K. NORMAN**
Florida Bar No.:0062154
*Lead Counsel*
**SHAINA STAHL**
Florida Bar No.: 77643
**NELSON MULLINS BROAD AND CASSEL**
390 North Orange Avenue, Suite 1400
Orlando, Florida 33802-4961
Phone: (407)839-4200 / Fax: (407)425 -8377
Todd.norman@nelsonmullins.com
Shaina.stahl@nelsonmullins.com
Angela.gonzalez@nelsonmullins.com
*Attorneys for Defendant Seminole County*

/s/ Lynn Porter-Carlton
**A. BRYANT APPLEGATE**
*Seminole County Attorney*
Florida Bar No. 346926
**LYNN PORTER-CARLTON**
*Deputy County Attorney*
Florida Bar No. 0455301
Seminole County Attorney's Office
1101 East 1st Street
Sanford, Florida 32771
Phone: (407)665-7254 / Fax: (407)665-7272
bapplegate@seminolecountyfl.gov
lporter-carlton@seminolecountyfl.gov
dedge@seminolecountyfl.gov
*Attorneys for Defendant Seminole County*