### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**RIVER CROSS LAND
COMPANY, LLC,**

**Plaintiff,**

**v.**                                              **Case No:   6:18-cv-1646-ACC-LRH**

**SEMINOLE COUNTY,**

**Defendant.**

_____

### ORDER

This cause comes before the Court on Seminole County's Motions for
Summary Judgment (Doc. 35) and to Exclude the Opinions and Expert Testimony
of Dr. Charles Cowan (Doc. 34), as well as Plaintiff River Cross Land Company,
LLC's ("River Cross") Motion for Partial Summary Judgment (Doc. 36). The parties
have filed Responses (Docs. 41, 42, 43) and Replies (Docs. 45, 48) to the respective
Motions. The Motions are ripe for review.

## I.     INTRODUCTION

The timing, the litigants, and the type and location of development proposed
in this case are very rarely present in a Fair Housing Act claim. River Cross, as a
non-minority commercial developer, is not the traditional tenant or non-profit
plaintiff committed to integrating the housing available in a historically segregated
community. The vast majority of the development proposed by River Cross in this

case is commercial and, if approved, would comprise some of the *only* large commercial and multi-family development built in the rural section of Seminole County, which is inhabited by a tiny sliver of the County's half a million residents.

The River Cross proposal to develop affordable housing in such a rural area is also highly unusual. The proposed site currently has no infrastructure: no roads, no bridge, no public transportation, no potable water or sewer utilities, and no expansion of such infrastructure is planned by the County. The land is surrounded by a significant river basin area, a wilderness preserve, rural agricultural lands, and more than forty percent of the proposed site consists of wetlands. Affordable housing tax credits are awarded to developers for units in areas with public transportation and employment opportunities for the low-income tenants.

River Cross decided to add the "affordable housing" provision to its application at the last minute, just two days before the County Commission meeting and after it became clear that County staff and the zoning commission would recommend denial of the River Cross application. During the County Commission meeting, although River Cross represented that it intended to develop what it characterized as one of "the best premier communities" in Seminole County, River Cross disingenuously used the threat of a lawsuit under the federal Fair Housing Act[1]

---

[1] At the public hearing, River Cross raised the specter of litigation under the federal Fair

as the fulcrum to urge County Commissioners to approve the entire River Cross proposal for 1.5 million square feet of commercial space and 1370 densely-grouped residential units.

Since 1991, in order to avoid "urban sprawl," Seminole County's urban-rural boundary line has restricted development of commercial projects like the River Cross proposal to the western two-thirds of the County where there is sufficient infrastructure and vacant land. Undeveloped land in the County to the east of the Econlockhatchee River Basin lacks the adequate infrastructure to support commercial and dense residential developments, and is comprised primarily of parks, conservation area, agricultural land, and timberland. Single-family residences on five- and ten-acre lots—completely dependent on well-water and septic tanks—constitute the other fifth of the rural area. At the time the County considered the River Cross proposal in 2018, a significant amount of land in the urban area was vacant and still available for development of commercial and multi-family projects, with the concomitant infrastructure already in place. Seminole County has more than 5,000 affordable housing units located in this urban area close to transportation and employment.

---

Housing Act unless the County was willing to "move the rural boundary" to accommodate the entire River Cross proposal and "bring the rural boundary into greater compliance with the federal Fair Housing Act." (Doc. 35-2 at 91-92).

During the Board of County Commissioners meeting, County staff and urban-planning consultants explained that, without River Cross providing adequate and accurate plans for expanding infrastructure requirements for higher-density water and wastewater services, transportation, and protection of the natural resources abundant in the rural area, they recommended that the River Cross application be denied as incomplete. At the end of the four-hour meeting, the Chair of the County Commission summed things up: the boundary line has "nothing to do with the rural area. It has everything to do with the urban area because the [County's] policy is to develop those particular areas of the urban area before developers would go to the cheaper land in the rural area. ... . [A]nd the rural boundary has more to do with all of the county, [not] with just the eastern rural areas."[2] The Board of County Commissioners followed the staff recommendation and denied the River Cross proposal. Shortly thereafter, River Cross sued the County under the Fair Housing Act.

River Cross asserts a single claim against Seminole County under the Fair Housing Act, alleging that the boundary line "perpetuates a segregative effect." Unsurprisingly, River Cross lacks standing to sue because it has not shown that the 75 units of "affordable" or income-based housing would serve minority residents.

---

[2] (Doc. 35-2 at 329).

River Cross has also failed to produce any evidence that the County's denial of the proposal significantly perpetuates or reinforces segregation, which is also fatal to its claim. Moreover, even if River Cross had significant evidence that the boundary line caused a segregative effect, the County has shown it had legitimate, non-discriminatory reasons for denial of the River Cross proposal based on its desire to avoid "urban sprawl" under the governing Florida community planning statutes, and River Cross has failed to propose a less-discriminatory alternative.

 For the reasons set forth in detail below, Seminole County's Motions to Exclude the Expert Opinions of Dr. Charles Cowan and for Summary Judgment will be **granted** and River Cross' Motion for Partial Summary Judgment will be **denied**.

## II.   BACKGROUND

### A.  Brief Introductory Background

In 2018, Plaintiff River Cross Land Company, LLC,[3] a non-minority private developer, proposed a plan to convert approximately 670 acres of real property in the undeveloped, rural area of Seminole County, adjacent to the Econlockhatchee River[4] Basin, into a large commercial and residential development which would be

---

[3] River Cross Land Company, LLC has three active members: the "sole decisionmaker," Christopher Dorworth, Rebecca Dorworth, and their closely-held business, CED Strategies. (Doc. 35-3 at 17).

[4] The parties and witnesses frequently refer to this river as the "Econ" River.

comprised of 1.5 million square feet of commercial space, 600 single-family residential lots, 270 townhome lots, and 500 multi-family apartment units.

Two days before the Board of County Commissioners voted[5] on the application, counsel for River Cross sent County staff an email adding the condition that fifteen percent of the multi-family units would be "affordable housing units" if it received approval for funding from a state agency. At a public meeting on August 14, 2018, after hearing from River Cross and residents of Seminole County, the County Commissioners denied the River Cross proposal. Plaintiff subsequently filed suit under the Fair Housing Act on October 2, 2018.

### B. County-City Conflict and Passage of the County's Charter Amendment

Seminole County, spanning approximately 220,000 acres, is made up of densely-populated urban pockets in its western portion and less densely-populated rural areas in the eastern section; about one-third of the county is designated a "rural area." (Doc. 1 ¶ 5; Doc. 52-1 at 11). According to the Decennial Census, the population of Seminole County in 2000 was 365,196; in 2010, the population was 422,718 persons.[6] In 2019, the population was estimated to be 471,826. (Doc. 52-1

---

[5] Although River Cross had broached the subject of affordable housing orally during the Planning and Zoning Commission meeting on July 11, 2018, River Cross did not make a formal written submission until August 10, 2018.

[6] The Court takes judicial notice of the 2000 and 2010 census figures available in the Census.gov's "FactFinder" resource. *See* http://www.census.gov/quickfacts. Judicial notice of adjudicative facts such as census data may be taken *sua sponte. See Moore v. Comfed Savings*

at 11). The percentage of the population living in the "rural areas" was less than 2% of Seminole County's total population. (Doc. 36-6 at 13).

The Econlockhatchee River (or "Econ River"), a 54-mile tributary of the St. Johns River, acts as the current rural boundary where the land in the County east of the River is predominately rural, and the western acreage is predominately urban and contains most of Seminole County's cities. (Doc. 1 ¶ 5). The property that River Cross planned to develop abuts the Econ River and preservation-managed lands to the west, and rural Orange County to the south at the Orange-Seminole County line (Doc. 35-5 at 7-8).

Although Seminole County is a charter county, it did not have the power to preempt annexation of land in the County until a charter amendment was passed in 2004. "The most significant feature of charter counties is the direct constitutional grant of broad powers of self-government, which include local citizens' power to enable their charter county to enact regulations of county-wide effect which preempt conflicting municipal ordinances." *Seminole County v. City of Winter Springs*, 935 So. 2d 521, 523 (Fla. 5th  DCA 2006) (internal citation omitted) (holding that the amendment constitutes a proper exercise of the County's home rule power under Article VIII of the Florida Constitution).

---

*Bank*, 908 F.2d 834, 841 n. 4 (11th Cir. 1990).

Although the County acted in 1991 to create an urban-rural boundary to protect rural and environmentally-sensitive lands from urban sprawl in the eastern part of the County—along the eastern edge of the City of Winter Springs—the County's charter did not provide for *preemption* of conflicting municipal land use regulations and was not effective in controlling the urbanization of its eastern rural lands. *Id.* at 524. Consequently, "the City could simply annex property protected from dense development under the County's Comprehensive Plan [and] [o]nce incorporated within the City's jurisdiction, the City could then incorporate the land into its own comprehensive plan and change the land use designation to allow for high-density development." *Id.* Thus, the County's urban-rural boundary was not effective at deterring urban sprawl "[b]ecause the County's charter provided that the municipal ordinance would control in the event of a conflict" such that the "City's newly amended comprehensive plan would then control over the rural designation in the County's [p]lan, and development would proceed." *Id.*

As the Florida Fifth District Court of Appeal summarized the situation:

This pattern was well documented in the record below, with testimony regarding a dispute that arose over development of a subdivision at the eastern edge of the City [of Winter Springs] known as Battle Ridge. Litigation ensued between the County and the City. The litigation settled when the County agreed to withdraw its challenge, allowing the development to proceed, with the implicit understanding that this development would represent the easternmost limit of the City's urban expansion. Shortly thereafter, however, the City increased the size of

the utility lines that serviced the 110 dwelling units planned for Battle Ridge to accommodate 1300 units. The City then proceeded to annex three additional parcels immediately east of Battle Ridge and within the County-designated rural area.

In response, the Seminole County Board of County Commissioners proposed a charter amendment to the electorate that would provide for County preemption of land use regulation in the rural eastern area of the County. The measure was placed on the ballot for public vote during the 2004 general election. The ordinance sought to amend the County charter by changing the language in Article I, Section 1.4 of the charter, from:

"Municipal ordinances shall prevail over County ordinances to the extent of any conflict." to:

"*Except as otherwise provided by this charter*, Municipal ordinances shall prevail over County ordinances to the extent of any conflict."

*Id.* at 524-25 (emphasis added).

The Charter Amendment—which was approved on November 2, 2004—added a new substantive section to Article V of the County Charter, which became a provision at issue in this case. The section contained provisions: (1) establishing the Rural Boundary and the legal description of the "Rural Area," incorporating them into the Future Land Use Element of the Seminole County Comprehensive Plan; (2) giving the Board of County Commissioners the authority to remove property from the "Rural Area" and amend the Rural Boundary consistent with the County's future land use designations; and (3) giving County ordinances precedence over municipal ordinances. *Id.* at 525. "The obvious purpose of the amendment was

to assure that the land use designations of the County's Comprehensive Plan would control the density and intensity of development on all land in the 'Rural Area,' regardless of whether the land was subsequently annexed into a municipality." *Id.* The Fifth District Court of Appeal held that "the people have chosen to grant preemptive land use regulatory power exclusively to the County. Their decision to do so constituted a perfectly valid election under the Florida Constitution." *Id.* at 529. (*See* Doc. 1 ¶ 5 (citing Seminole County, Fl., Ordinance No. 2004-36 § 1(d) (2004))).

### C. *Florida Community Planning Act and the County's Comprehensive Plan*

#### 1. *Community Planning in Florida*

Seminole County is a political subdivision of the State of Florida. (Doc. 1 ¶ 2). In 1985 the Florida Legislature enacted what is now known as the Community Planning Act,[7] to strengthen the processes of local governments in utilizing comprehensive planning[8] programs to guide and control development. Tony A.

---

[7] The Growth Management Act was enacted in 1985. Fla. Stat. Ch. 163. In 2011, the Florida Legislature revised these state planning statutes, renaming them the Community Planning Act, and "greatly reduced the state and regional agency oversight of planning and land development activity. Fla. Stat. § 163.3161. However, the Act did not significantly reduce the planning requirements for Florida's county governments." GUIDE at 126.

[8] The Act requires that, before a county issues any development orders, the county must ensure that the action is consistent with the comprehensive plan, thus, a local government who decides to approve a development that is not consistent with the plan must amend the plan first. *See* Fla. Stat. 163.3194(1)(a) ("After a comprehensive plan . . . has been adopted, . . . all actions taken in regard to development orders by governmental agencies in regard to land covered by such plan or element shall be consistent with such plan or element as adopted.").

Arrant, *Planning and Growth Management*, FLA. COUNTY GOV'T GUIDE, Ch. 11, at 126 (Fla. Assoc. of Counties 3d ed. 2012) ("GUIDE"). Consequently, Florida has "one of the most comprehensive and progressive land use planning programs in the country." *Id.* at 123. Local governments must adopt, maintain, and implement land use plans and development regulations for all future development actions, and all development actions must be consistent with the adopted plan. *Id.* at 126, 128 (citing Fla. Stat. § 163 *et seq.*). Once a county's "comprehensive plan" is adopted and found to be in compliance by the Department of Community Affairs, it then becomes the "public policy decision making" guide for all development decisions within the county. *Id.* at 126; Fla. Stat. § 163.3184. The Act is intended to help local officials make decisions regarding the extent and timing of future growth, density of housing, the intensity and compatibility of commercial or industrial development, and the timing and distribution of growth in geographic locations of new development, as well as the supporting infrastructure and the environmental resources of the area. GUIDE at 126. The Act also requires that all comprehensive plans be "financially feasible" and ensure that, when permitting development, the "specific area proposed for development has the necessary supporting infrastructure and other development characteristics that support the new development." *Id.* at 127.

The 1985 Act further requires that all plans include an adopted Future Land Use Map,[9] which depicts the future land use categories and policies that establish the maximum densities for residential development and the maximum intensities for non-residential development; all local governments must also adopt land development regulations or local ordinances for comprehensive plan elements; these include, for example, provisions that "ensure the protection of environmentally sensitive lands" or "provide that public facilities and services meet or exceed the standards established in the capital improvements element"; and "ensure safe and convenient traffic flow." *Id.* at 125, 136. Beginning in 2004, all local governments were also required to identify adequate water supply sources to meet the anticipated future demand for the established planning period. *Id.* at 125-26. An application to rezone property must be consistent with the property's Future Land Use Map and, the applicant must apply for a Future Land Use Map (FLUM) amendment. Fla. Stat. Ch. 163.3164. The FLUM application must be reviewed by the local planning agency, in this case, the Seminole County Planning and Zoning Commission, which makes a recommendation to the local Board of County Commissioners regarding

---

[9] The following land uses are shown on the FLUM: 1. Residential use; 2. Commercial use; 3. Industrial use; 4. Agricultural use; 5. Recreational use; 6. Conservation use; 7. Educational use; 8. Public buildings and grounds; 9. Other public facilities; 10. Historic district boundaries; 11. Transportation boundaries; 12. Natural resources including, rivers, wetlands, lakes, etc.; and 13. Public buildings. GUIDE at 128-29 (citing Fla. Stat. Ch. 163, Part II).

whether the proposed FLUM amendment is consistent with the County's Comprehensive Plan.

Certain data is considered in support of the land use designations and the Future Land Use Map to determine whether the plan discourages the proliferation of "urban sprawl": surveys, studies, and analysis of the county, including the amount of land required to accommodate anticipated growth; the projected population; the character of undeveloped land; the availability of public services needed to serve new development, and the need for development. GUIDE at 129. "Urban sprawl" refers to urban developments that are located in predominantly rural areas, or rural areas interspersed with generally low-intensity or low-density urban uses, and that are characterized by: (a) premature or poorly planned conversion of rural land for other uses; (b) the creation of areas of urban development which do not relate to land uses which predominate in the adjacent area; or (c) the creation of areas of urban development which fail to maximize the use of existing public facilities and services. *Id*.; Fla. Stat. § 163.3164(52). Urban sprawl is typically seen in land use patterns that "leapfrog," are scattered, contain strip commercial space, or are large expanses of predominantly low-intensity, low-density, or single-use development. GUIDE at 129.

In a local government's plan, it must also address the affordability and the availability of housing for all segments of the county's population, considering the

housing stock and provision of adequate sites for future housing with supporting infrastructure and public facilities. *Id.* The plan must consider infrastructure elements such as the sanitary sewer, solid waste, drainage, potable water, and natural groundwater aquifer recharge availability, establishing priorities for future infrastructure facilities to serve the existing and projected populations in future developments. *Id.* Local comprehensive plans must also address the conservation, use, and protection of natural resources, including water, water recharge areas, wetlands, waterwells, soils, flood plains, rivers, lakes, fisheries, wildlife, and other natural resources. *Id.* at 130.

### 2. Seminole County's Comprehensive Plan

In 1987, Seminole County adopted the general "rural" and the "suburban estates" future land use designation for the eastern rural area of the County which has "a lot of environmentally sensitive areas." (Doc. 35-2 (BCC Tr.) at 26). In 1991, after the County submitted its Comprehensive Plan to the Florida Department of Community Affairs, the Department cautioned that the "suburban estates" dsignation of one dwelling unit per one acre was considered to be "urban sprawl." (*Id.*). In response, Seminole County commissioned a study for the east rural area and subsequently created several "rural" future land use designations and amended the agricultural zoning districts—including the one at issue on the proposed site in this

case—of one dwelling per ten acres. (*Id.*). The adjacent land to the north and west of the proposed site were developments zoned for one dwelling per five acres; to the south (in Orange County) the land was zoned to allow one dwelling per ten acres; and to the west was Seminole County's preserved management wilderness area.[10] (*Id.* at 27).

The Seminole County Board of County Commissioners (the "BCC") created the "East Rural Area" of Seminole County when it adopted the 1991 Seminole County Comprehensive Plan Update. (*Id.* at 28). This was done for planning purposes to: (a) "protect the character of the area as agricultural and rural residential"; (b) ensure the cost-effective provisions of public services; (c) discourage urban sprawl and limit urban uses to eliminate the need for significant investments in capital improvements; and (d) protect and conserve natural and environmental resources in the county such as the wetlands, floodplains, native vegetation, environmentally sensitive areas including the Econlockhatchee River, and groundwater aquifer recharge areas. (*Id.*; Doc. 35-5 at 8). Following adoption by the County of the "rural character plan" in 2006, the County focused its planning

---

[10] The Econ River Wilderness Area was purchased by Seminole County in 1994 for $3.5 million through the County's Natural Lands Program. *Developer Chris Dorworth Submits Plans For Seminole's Econ River Wilderness Area*, ORLANDO SENTINEL, April 3, 2020 (describing land swap settlement proposal). Seminole County voters previously approved funding which was used to purchase natural lands in the east rural area of the County. (Doc. 35-2 at 328).

policy to maximize development in the urban areas through the County's comprehensive planning, in the future land use element, and in transportation planning, by intentionally creating compact land use patterns to discourage sprawl and decrease automobile trips. (Doc. 35-2 at 33). Comprehensive plan amendment proposals in Seminole County are evaluated based on timing, compatibility, and public facility considerations as major considerations. (*Id.* at 35-36).

### D. History of the Proposal's Consideration by Seminole County

#### 1. Purchase Agreement

On February 3, 2018, River Cross entered into a Real Estate Purchase Agreement (the "Purchase Agreement") to purchase the property for the proposed development—consisting primarily of old pastureland, citrus groves, and woods— from the seller, Hi-Oaks, LLC. (Doc. 35-6).[11] The Purchase Agreement contains a provision that makes the sale of the proposed site contingent on "satisfaction as to the feasibility of developing the Property for the Development." (*Id.* at 6).

On May 1, 2018, to determine the project's feasibility, River Cross filed an application to convert approximately 670 acres in the rural area, east of the Boundary Line, from rural-agricultural zoning to planned development zoning into 1.5 million

---

[11] *See Dorworth Pitches New Proposal for River Cross Property*, ORLANDO SENTINEL, April 7, 2021.

square feet of commercial space, 600 single-family residential lots, 270 townhome lots, and 500 multi-family units. (Doc. 1 ¶ 12). [12] According to the County's Comprehensive Plan, the applicable rural zoning designations [13] allow rural residential development at densities equal to or less than one dwelling unit per five acres and permit agricultural uses; this Rural Area of the County is "where urban services are minimal or non-existent." (Doc. 35-5 at 8).

On May 24, 2018, the DRC provided River Cross with a Development Review Committee ("DRC") Comment Document containing the DRC's comments on the application. (Doc. 35-8). On May 30, 2018, River Cross had a meeting with the County staff at the Development Review Committee regarding its application. (Doc. 1 ¶ 16). Following the meeting, River Cross requested an extension of the DRC meeting and met with staff again on June 5, 2018. (Doc. 35-2 at 37). The June 5, 2018 DRC meeting lasted approximately 1.5 hours until River Cross had no further

---

[12] River Cross applied for amendments to: the Charter Section 5.2 to remove the Property from the East Rural Area; the Comprehensive Plan to amend the Urban/Rural Boundary Line to remove the Property from the East Rural Area; the Future Land Use map from "Rural 5" to "Planned Development"; and rezoning of the Property from "A-5 Rural" Zoning to Planned Development zoning. (Doc. 35-5 (Planning & Zoning Comm. Tr.) at 7-8; Doc. 36-8 ¶ 3).

[13] The Rural 5 Future Land Use designation limits development to equal to or less than one dwelling unit per five acres and the A-5 Zoning classification permits such uses as rural residential, agricultural operations, and attendant structures such as barns, silos, and riding stables. (Doc. 35-5 at 8).

questions. (*Id.*) River Cross did not respond to the DRC Comments. (Doc. 35-5 at 16).

2. *Planning and Zoning Commission Meeting*

On July 11, 2018, River Cross presented the application to the Planning and Zoning Commission. (Doc. 35-5). The initial development order submitted by River Cross did not contain any reference to "affordable housing" targeting minorities. (Doc. 35-7). In its rebuttal presentation, River Cross mentioned that it planned to include 15% "affordable housing" in the development; however, affordable housing was not included in the submitted development order or plan. (Doc. 35-5 at 20-22). No additional written submission explaining the proposed "affordable housing" provision was submitted to the Planning and Zoning Commission.

Following the River Cross presentation, the Planning and Zoning Commission heard from thirty audience members who spoke in opposition to the project; no one in the audience spoke in support. (Doc. 35-5 at 18). Rebecca Hammock, the Planning and Development Division Manager, provided a summary of information from the Staff Report[14] to the Planning and Zoning Commission, specifically noting with regard to the affordable housing provision:

_____

[14] The Staff Report was part of the Agenda packet and part of the public record. (Doc. 35-5 at 7).

- 18 -

> The applicant's narrative states that 15% of the residential units within the proposed project will be developed as Affordable Housing. . . . However, the proposed Development Order and Master Plan have no provisions or commitments to [e]nsure the development of affordable units, nor do the documents specify what income level would be served.

(*Id.* at 9; *see also* Doc. 35-2 at 18). Ms. Hammock presented numerous additional issues the County staff had specifically identified with the River Cross proposal:

> * The subject property is located within the Econ River Corridor Protection Zone and would be required to comply with all the regulations mandated by the protection zone.
> * The Econ River is classified as an outstanding water body, which is designated worthy of special protection because of its natural attributes.
> * The subject property is also located in the Geneva Fresh Water Lands Resource Protection Area, which pursuant to the Comprehensive Plan Conservation Element Policy 1.10 requires appropriate land use densities and intensities to protect its critical recharge function.
> * The subject property contains 311 acres of flood plain, 275 acres of wetland, and six (6) wildlife species that are listed as threatened or species of special concern including the gopher tortoise, Florida Sand Hill Crane, and the Little Blue Heron.
> * The subject property is located outside of Seminole County's existing permitted utility service area.
> * Seminole County Comprehensive Plan states that new development outside adopted central service areas shall not be designated nor constructed with central water and/or sewer systems.
> * However, development densities and intensities as requested by the applicant would require connection to central water and sewer.
> * As part of the requested Urban/Rural Boundary Amendment, data and analysis is required by the Future Land Use Element Standards for amending the Urban/Rural Boundary to demonstrate the availability of facilities and services in the orderly, efficient, and cost effective provision of service.

\* Such analysis, as outlined in the Staff Report, was not provided with the application.

\* In addition, extending water and sewer service to the subject property would require amendments to the County's water and sewer Master Plan and modifying the County's Consumptive Use Permit with the St. Johns River Water Management District.

\* In addition, supplying potable water and sanitary sewer utilities to the subject site would require crossing the Econ River.

\* Policy FLU 1.10 of the Comprehensive Plan states that there shall be no additional crossing by road, rail, or utility corridors unless three conditions are met: 1) there is no feasible or prudent alternative to the proposed crossing as determined by the County, 2) all possible measures to minimize harm to the resources of the Econ River Basin will be implemented, and 3) the crossing supports an activity that is clearly in the public interest as determined by the County.

\* The application does not demonstrate that these three conditions have been met.

\* A transportation analysis for the River Cross PD was prepared by VHB and there are multiple outstanding issues with this analysis as outlined in the Staff Report.

\* In addition, the application did not adequately address how the needed transportation improvements to support the proposed development would be funded or constructed.

\* It does not appear that any coordination has occurred with Orange County.

\* For example, the narrative states that the extension and four-lane widening of McCulloch Road from Old Lockwood Road to County Road 419 is expected to be constructed as part of the Sustany and River Cross developments.

\* The Sustany project is not currently an approved or active project in Orange County.[15]

---

[15] Orange County Commissioners had rejected the nearby Sustany project in November 2016. (Doc. 35-2 at 207; *Orange County Rejects Controversial Project East of the Econ River,*" ORLANDO SENTINEL, Nov. 15, 2016). McCulloch Road runs along the county line between Seminole County to the north and Orange County to the south, and the road apparently does not extend to the proposed development site for the River Cross project.

* The proposed River Cross Development Order does not make any commitments with regard to the developer funding, constructing, or conveying right-of-way for the improvements to McCulloch Road.

* The extension of McCulloch Road would also require demonstration of compliance with Future Land Use Policy 1.10 to cross the Econ River and the application did not demonstrate the three conditions in the policy had been met.

* Thus, without the additional information the report is incomplete and compliance with the County's Comprehensive Plan policies related to transportation cannot be established.

* The proposed PD Zoning designation and associated Master Development Plan have been evaluated for compatibility with the Land Development Code of Seminole County in accordance with Chapter 30, Part 25.

* The applicant submitted an application to rezone the subject property to Planned Development and it went through one review cycle with the Development Review Committee and they chose not to resubmit to Staff comments.

* The deficiencies in the applicant's submittal precluded determination of consistencies with the County's Land Development Code requirements including Section 30.445(a) Master Development Plan Submittal Requirements and Section 30.442 PD Permitted Uses.

* In addition, the proposed PD Zoning designation, as submitted, appears incompatible with the surrounding area and the trend of development in the area.

* The proposed PD with a maximum density of 30 dwelling units per acre, intensity of 0.6 F.A.R., and a maximum building height of 75' is incompatible with the surrounding Future Land Use and Zoning designations of Rural 5 and A-5 in Seminole County, as well as with the adjacent Orange County Future Land Use designation to the south of Rural 1 per 10 [acres].

* The Rural A-5 Zoning classification permits rural residential uses and agricultural operations.

* Therefore, the proposed urban uses within the PD could create conflict for the allowable agricultural uses on the surrounding properties.

> \* The PD proposes buffers of only 25' and 50', which are not sufficient to create compatibility along adjacent rural land uses and provide a clear separation between rural and urban uses.
>
> \* Thus, the proposed project does not support the objectives of the PD Zoning designation, because it does not provide adequate buffering and transitions to maintain compatibility between the proposed PD and surrounding uses.
>
> \* The County Comprehensive Plan Future Land Use Element contain standards of review for Comprehensive Plan Amendments, as well as standards for amending the Urban/Rural Boundary, which include demonstration of need, locational analysis, consistency with the goals, objectives and policies of the Comprehensive Plan.
>
> \* Staff has determined that the standards of review for both the Comprehensive Plan Amendments and the standards for amending the Urban/Rural Boundary have not been met as outlined in the Comprehensive Plan Summary Information Report attached as Exhibit 11 to the Staff Report, which also includes the Balmoral Group Technical Memorandum. . . .
>
> \* Staff finds the request to be inconsistent with the Comprehensive Plan, Land Development Code, and incompatible with the trend of development in the area as detailed in the Staff Report in your agenda packet and contained in the public record.

(Doc. 35-5 at 5-11).[16] In response to a question from the Chair of the Planning and

Zoning Commission, Michelle Ertel, concerning whether any negotiations had

occurred between River Cross and County staff to facilitate its ability to meet the

standards that the County requires, Ms. Hammock responded that staff

recommended denial in part based on insufficiency of the application because, after

---

[16] These identical concerns of the County staff were presented, nearly verbatim from the written recommendations in the Report, to the Board of County Commissioners at the August 14, 2018 meeting by Bill Wharton, the Principal Planner with the Planning and Development Division. (Doc. 35-2 at 16-25).

one review cycle through the DRC, River Cross chose not to resubmit to address the staff comments, and instead requested to move forward through the public hearing process. (Doc. 35-5 at 11). Following the presentations, the Planning and Zoning Commission voted on July 11, 2018 to recommend denial of the River Cross rezoning application and proposed amendments. (*Id.* at 23).

### 3. August 10, 2018 Email Regarding Affordable Housing

Late in the day on Friday, August 10, 2018–effectively one business day before the Tuesday, August 14, 2018, BCC meeting when the River Cross application would be considered—counsel for River Cross sent an email to the County Commissioners and County staff with the subject line "River Cross: Supplemental Information" and "a few items for consideration as you review the staff report" for Tuesday's River Cross hearing. (Doc. 35-11). This email included an updated Proposed Development Order with a provision for "affordable housing" that counsel had discussed at the July 11, 2018 Planning & Zoning Commission meeting but had not submitted in writing until August 10, 2018. (Docs. 35-12; 35-2 at 319).

The updated Proposed Development Order contained a new section on "affordable housing," in which River Cross stated its intention that 15% of the 500 multi-family units—75 units—within the Project would be "developed as affordable

housing units." (Doc. 35-12 at 3, § 3(B)(g)). The "affordable housing" provision, as proposed, was contingent on the approval of "funding from the Florida Finance Corporation[17] for the development of the affordable housing units" and only if "the funding was obtained within thirty days of the issuance of the Certificate of Occupancy for the multi-family units." (*Id.*). If River Cross was "unable to obtain such funding within thirty days, the units would revert to market-rate units." (*Id.*).

This was the first time that the River Cross Proposed Development Order included a reference to affordable housing. (Doc. 35-12). When Seminole County staff asked counsel for River Cross whether the "Supplemental Information" regarding the inclusion of the "affordable housing" application to the Florida Housing Finance Corporation was part of a "formal resubmittal," counsel replied that the August 10 Proposed Development Order was for "informational purposes" only. (Doc. 35-11 at 1). As such, the County planning staff treated it as "just for information" and the "staff did not do a formal review on it." (Doc. 35-2 at 320).

### 4. August 14, 2018 Board of County Commissioners Meeting

On Tuesday, August 14, 2018, the BCC considered the River Cross application: (1) to amend Seminole County's Comprehensive Plan and the Rural Boundary Line to remove the Property from the Rural Area; (2) to amend Seminole

---

[17] The correct name of the agency is the Florida Housing Finance Corporation.

County's Future Land Use Map to remove the Property from the Rural Boundary Line; and (3) to rezone the Property from Rural-5 to Planned Development zoning. (Doc. 35-2 at 25, 35). At the meeting, fifty-one residents spoke in opposition to the River Cross Project; only the seller of the Hi-Oaks property spoke in support.[18] (Doc. 35-2 at 185). The County staff repeated their concerns, first presented at the Planning and Zoning Commission meeting, to the Board of County Commissioners at the August 14, 2018 meeting. (Doc. 35-2 at 16-25). In addition to opining that the request was "inconsistent with the comprehensive plan, the land development code, and incompatible with the trend of development in the area," the staff found "the application to be incomplete" and recommended that the Board of County Commissioners deny the River Cross application and rezoning of the land. (Doc. 35-2 at 24, 35).[19]

At the end of the BCC Meeting, Seminole County Commissioner Dallari made a motion to deny the River Cross application based on the evidence presented and his opinion that the application was incomplete. (*Id.* at 322). The rest of the Seminole County Commissioners voted on the motion to deny the River Cross

---

[18] One Commissioner received 538 emailed communications; another had received more than 100 phone calls. (Doc. 35-2 at 8).

[19] As a practical matter, if the first application to amend the urban boundary falls through on the standards of review, the next two applications would be moot, as the urban future land use or rezoning designation will not be amended if the application does not meet the first standard to amend the urban rural boundary. (Doc. 35-2 at 35).

application[20] and it passed unanimously, which meant that the proposed Boundary Line Amendment was denied as well; the County subsequently issued a Denial Development Order. (*Id.* at 330).

As the County staff explained, in conjunction with amendment of the Seminole County urban-rural boundary, an applicant must show a demonstration of need for the project with a locational analysis of the proposed amendment area, and it must be consistent with the goals, objectives and policies of the local comprehensive plan and regional plans. (*Id.* at 35, 67). The analysis includes assessment of whether there is a "the lack of suitable or vacant land in the urban area to provide affordable housing" (*Id.* at 36), the economic development, and the critical public facilities. (*Id.* at 68). The applicant "shall provide" the "data and analysis" to document that additional lands are: (1) "required to support affordable work force or obtainable housing opportunities and choices in proximity for employment opportunities and public transportation" or (2) "needed to achieve the adopted redevelopment goals of the County because of the lack of suitable re-developable or vacant land within the urban area." (*Id.* at 36). Under the Seminole County Code, an applicant is charged with providing the County enough

---

[20] Since the BCC voted not to transmit the proposed Comprehensive Plan Amendments at the conclusion of the Transmittal hearing, the effect of the BCC action was to deny the River Cross application. Since there was no pending Comprehensive Plan or PD rezoning application, it was unnecessary to modify the Charter Rural Boundary.

documentation to determine that the additional developable land is needed and the existing urban area is insufficient to achieve that outcome. (*Id.* at 38).

To demonstrate a need to change the comprehensive plan, River Cross had to show a lack of vacant land in the urban area for affordable housing and economic development. River Cross stated that its proposal was "in compliance with this element of the standard of review based on the fact that they were providing 15 percent affordable housing" and "the County lacks affordable housing." (*Id.* at 36). "However, as Ms. Hammock explained during the BCC meeting, that is not the standard." (*Id.*). Instead, "the standard is whether there is a lack of vacant land in the urban area to provide for affordable housing," and the "staff has determined that the standard has not been affirmatively met." (*Id.* at 36-37).

Craig Diamond[21] of the Balmoral Group, serving as a consultant to the County primarily for long-range population projections, opined that the "demonstration of need" element was not met by River Cross "at all," and the other two required elements were met only "in part." (*Id.* at 67-68). Mr. Diamond explained that, even though "the applicant is required to provide information to qualify," the River Cross proposal lacked the sufficient documentation to make a proper assessment, and "a

---

[21] Mr. Diamond has fourteen years of experience in urban planning for local and regional governments. (Doc. 35-2 at 65).

lot of the [regional] policies that were provided" by River Cross were "really not applicable and taken out of context." (*Id.* at 69-70).

Mr. Diamond did not think "any" of the analysis River Cross provided as justification for moving the urban boundary "passed muster": based on general population and general housing needs; affordable housing and workforce housing; occupation and economic development; and critically needed public facilities. (*Id.* at 71). "Insufficient data was provided or insufficient demonstration that there was a need beyond what the existing urban area could provide; they were "a critical lapse in addressing [the] three required [] standards" from Seminole County's Comprehensive Plan. (*Id.*).

As Mr. Diamond explained to the Commissioners, River Cross had provided its own original population projections, with respect to the generalized population and housing need, even though Seminole County specifies that applicants "are to use the County's numbers and not use their own." (*Id.* at 72). In addition, he explained other deficiencies in the River Cross supporting materials:

> [River Cross] had opted to apply a "persons per household" (PPH) statistic—a typical census tool for looking at the density and persons per household—show[ing] a number that was smaller than th[ose in] the census as of 2016 for Seminole County. Critically, the applicant did not consider the future land use map category and the densities allotted therein for the various vacant parcels that were to be looked at. [The applicant] also failed to consider that [the County] ha[s] a bunch of additional policies looking at redevelopment and a wide range of other

> policies that ultimately do affect housing supply. So for population
> projections, [Balmoral has] been providing you population projections
> now for a couple of years. The applicant did look at the buildout …
> looking at 2038 as the endpoint. [Balmoral has] been providing data to
> [the County] in five-year increments out. So some interpolation was
> required. And the consultants [for] the applicant came up with 559,000
> in the year 2038; we had provided information about 552,000. Not a
> big difference [of 7,000], but the applicant applied a higher number,
> which in turn, is part of their justification for [] the additional housing
> that they were looking to supply [in the County]. Again, the numbers
> have been provided to [Seminole County and] have been accepted by
> the County and are in use by your departments.

(*Id.* at 71). Mr. Diamond further pointed out that River Cross also used its own values

for "persons per household" which skewed the population figures on the high side,

and he had to correct those population figures to so that the long range projection

was "closer to 31,000" new units based on long range projections and not the 41,000

new units that the River Cross consultant's report indicated that the County would

need by 2038. (*Id.* at 73). The "next step" in his analysis was calculating whether

there was enough vacant land to accommodate or "absorb" the expected population

growth in households:

> The existing vacant land is a critical component to understand what is
> the absorptive capacity of the county going forward. The applicant
> determined . . . [there were] 7,300 vacant residential lots per the
> property appraiser . . . [Balmoral has been] using the certified tax rolls
> from the Department of Revenue for all of our work for counties. . . .
> That's the standard. . . . [A]ccounting . . .[for] parcels that specifically
> are residential . . . we had 8,277. A difference of about 978 [lots]. It's
> not small [] when we're looking at this sort of number. . . . [W]orking

with numbers that we've got, we're now down to closer to long-range
need within the planning horizon after 2038 of about 30,000 units.

(*Id.* at 74). He described the "critical touch point" of the erroneous analysis provided

by River Cross as the fact that its consultant had "assigned a single unit per each

vacant lot and subtracted that" from the total, even though it distorted the absorptive

capacity by "in a sense, extending th[e] approach" used as to the proposed site, zoned

as rural (R-3, R-5, R-10), to the analysis of absorption on a "countywide" basis. (*Id.*).

However, by Mr. Diamond's calculation applying the population figures the County

uses derived from the Census—figures that River Cross declined to utilize—and the

number of available lots from Department of Revenue records, there was sufficient

vacant land in the urban area and this directly contradicted the "demonstration of

need analysis " River Cross had relied upon. He said in summary to the BCC:

> [T]he point is under the buildout, the current FLUM categories more
> than address 30,000 units going out through your planning horizon. The
> plan developments that you've got in the pipeline alone, vacant lots
> within those not yet built account for *almost 90,000 units.* Even if you
> were to build out at a density of about two-thirds of what's allowable
> under your [comprehensive] plan, you'd still have the cushion to get
> out through your planning horizon.
>
> So to emphasize again, that 40,000+ units that's vacant lots only with
> no other policies that you've got in your comp plan attached. [The]
> County's policies, and those of several of the city's, all provide bonuses
> for properties that are pre-certified. Most importantly are in key transit
> corridors and around the Lynx [bus] stations and Sunrail [trains]. A lot
> of those policies provide up to 50 percent bonus, recognizing that there
> are . . . policies operating both within the county and your sister cities,

there are an additional 54,000 potential units if all built out at the maximum intensities that the comp plans currently provide. You even have today a couple projects coming in for redevelopment, . . . some of those will be approved and additional units in a sense become available for absorption. What we're looking at is a static interpretation of your comp plan of vacant lots and lots that are [] free [for] development based on current use and . . . proximity to [services in the urban area]. . . . [I]n total, we're looking at about 98,000 lots that are potentially available to you through the planning horizon. Certainly a lot more than 30 [thousand] or even the 41 [thousand] or so that the applicant originally contemplated.

(*Id.* at 75-76 (emphasis added)). As Commissioner Horan pointed out "that's one of the reasons why we've adopted said policies to encourage development in those urban areas . . . [t]o make sure that . . . those particular lots . . . [that] aren't all batched together. . . . [s]o that the last one in doesn't get left out in the cold, we have these policies that encourage development in those areas." (*Id.* at 75).

Ms. Hammock recounted the discussions River Cross had with County staff regarding the lot sizes, transitional land uses, buffer zones, and "justification [which] should be provided with the resubmittal as to why this property is unique and should be removed from the rural area and why removing it wouldn't create a domino effect." (*Id.* at 39-40).[22] "[T]he standards of review for amending the urban rural boundary are high [and] they're meant to be difficult or high standards to meet

---

[22] Of two other properties where the boundary line had been amended, one was 4 acres and the other had been the property annexed by the City of Winter Springs, as described in *Seminole County v. City of Winter Springs,* 935 So. 2d 521, 523 (Fla. 5th DCA 2006).

because they are to ensure that the development potential of the urban area had been fully exhausted before encroaching into the rural area." (*Id.* at 88).

Ms. Hammock further explained that the River Cross proposal as submitted would be "urban sprawl," in that it was "requiring an extension of public facilities and [] services in an inefficient manner and it fails to provide a clear separation between urban and rural uses. [River Cross] states that the project is, in fact, not urban sprawl because it proposes a mixed use development and is providing affordable housing." (*Id.* at 40). "However," she explained, the River Cross proposal "does not provide a linkage between their residential uses and their nonresidential uses. They're proposing all of the residential uses or majority of the residential uses within phase one, and their nonresidential uses within phase two. But they do not have any requirement within the [proposal] for the two [phases] to develop concurrently or to have a ratio of nonresidential and residential uses. Therefore, it ends up – it isn't truly mixed use at all." (*Id.*). She also noted that the proposal for "affordable workforce housing" was not a firm commitment either—River Cross had submitted it for "informational purposes" and stated that it "would apply for federal funding for affordable housing and [] if [River Cross] did not obtain it that it would revert to market rate rental apartment"; it was "really no commitment" because there was no assurance that the proposed "affordable housing units" would

"indeed exist as part of the Project." (Doc. 35-2 at 319). The principal of River Cross, Mr. Dorworth, acknowledged that there was no way to know whether the River Cross project would receive funding for the development of affordable housing. (Doc. 35-3 (Dorworth Dep.) at 213).[23]

### 5. *Affordable Housing Proposals in Seminole County*

Melody Frederick, the Compliance Officer for the Community Services Department, who specializes in affordable housing and development for the County, explained that as part of the competitive approval process for tax credits for affordable housing through the Florida Housing Finance Corporation an applicant has to demonstrate that there is a lack of suitable or vacant land in the urban area to provide affordable housing. (Doc. 35-2 at 41). The tax credit funding applications are evaluated primarily for the population the project will serve, the number of units the project will provide as well as "the proximity to services to transportation centers, employment, and the like." (*Id.*). The existing affordable housing units were scattered throughout the county and are not concentrated in a single area; Florida Housing Finance Corporation would not approve new developments in one particular census track where there were several tax credit projects already clustered

---

[23]  Mr. Dorworth testified the 15% would be of the 1370 total residential units (Doc. 35-3 at 210); however, the Proposed Development Order stated the affordable housing units would be 15% of the 500 multi-family units. (Doc. 35-12 at 3).

to avoid exacerbating the conditions where there is a concentration of people in poverty. (*Id.*) Ms. Frederick showed a list of approximately 4,800 units [24] of affordable housing in tax credit projects with 75 units or more (not including the County's home ownership programs) that had been recently developed. (*Id.*) There are very specific standards to receive funding for the tax credit process, and it was important to locate the housing near employment centers, transportation and transit areas because people with lower incomes needed to be able to get to work and transportation was a significant issue; the affordable housing was typically located in areas where infrastructure already existed.[25]

In Seminole County, the transportation centers were in the urban portion of the County, according to Ms. Frederick. In deciding where to place affordable housing, counties had traditionally considered the cost of housing not being more than 30 percent of a household income; but there more recently had been "a paradigm shift happening with affordable housing," to consider "a housing and transportation availability index" or an "affordability" index. . . To have a good score

---

[24] Ms. Frederick explained in response to a question from Commissioner Horan that the County actually had more than 5,000 FHSC properties, however, the listing she presented during the BCC meeting contained only those developments that contained at least 75 units, thus, comparable to the River Cross proposal. (Doc. 35-2 at 48).

[25] In partnership with other Central Florida cities and counties, Seminole County hired the Shimberg Center of Affordable Housing to create a model to help determine where affordable housing would be best suited to be located. (Doc. 35-2 at 45).

your housing costs and your transportation costs shouldn't exceed 45 to 50 percent of your income." (*Id.* at 46). The River Cross proposed site was in an area with a high number, "between 78 and 87 percent of any household in this area's income could be devoted to both transportation and housing costs, and that's because of its distance away from transit, bus services, things of that nature, which could cause a significant strain for households that have a limited income source." (*Id.* at 46-47). "The tax credit programs focus mainly on the most vulnerable populations that exist [such as] the elderly, disabled, and lower-income families. And so, when you take all of that into consideration, it gives a very telling picture for you. It's also important to note that during this entire process the applicant—neither the applicant nor the representative—ever contacted community services to sit down and kind of talk through these affordable housing issues." (*Id.* at 47) Had that occurred, she said, the County would have "been able to touch base with them and give them a little bit more direction and talk about all the ways that Seminole County does support affordable housing, equal funding, and other programs." (*Id.*).

In response to a question from Commissioner Horan noting that Seminole County BCC had been "on the tip of the spear with regard to affordable housing projects," Ms. Frederick explained:

> Seminole County's been very supportive of affordable housing. They're one of the few who actually put grant dollars to provide the

local contribution towards tax credit projects, generally $50,000 per development that is approved for tax credit does get grant funding approved through Seminole County, of course. And in my past work at other places there aren't very many local governments that actually put forth any money towards that. And so, I do want to say that Seminole County does look at things in a very effective way and you do try always to be as supportive as possible. And we typically get seven to eight applications for tax credit developers each year, but it's a very competitive process. But Seminole County has always put forth funding to support that as well.

(*Id.* at 49).

### 6. *Infrastructure Concerns*

Ms. Hammock explained that the County staff had analyzed whether the data and analysis "demonstrate[d] the availability of facilities and services and the orderly, efficient, cost-effective provision of services," and "whether the County ha[d] the fiscal capacity to provide adopted levels of service." (Doc. 35-2 at 36). Staff found that the standard had not been demonstrated to be affirmatively met for the services such as water and sewer, public safety, fiscal, county for fire and police, and transportation. (*Id.*). Therefore, the "major outstanding question" was: "What is the fiscal impact to the county for extending urban services and facilities in an area not previously planned for urban services and facilities?" (Doc. 35-2 at 36-37).

Mr. Diamond pointed out additional omissions in the River Cross proposal because there were "no details in the application provided for how water and sewer were going to be extended" or a time frame for capital improvements, or the fiscal

capacity impacts, which he calculated as $8.9 million based on county rates and the anticipated size of the development. (*Id.* at 83). The County's Comprehensive Plan also called for "contiguous" urban development patterns to discourage sprawl and he pointed out that there were none next to the proposed site. (*Id.* at 85).

The manager of the County Utilities Engineering Division, Johnny Edwards, explained the County staff had informed River Cross that the infrastructure for potable water and sewer did not reach the proposed development and stopped west of the Econ River. (*Id.* at 51). Capital improvement programs and investment had all been made in the urban area, with no plans to go out into the rural area; potential growth and development within the service areas were all inside of the urban boundary. (*Id.* at 54-55). The County's "consumptive use permit issued by the St. Johns River Water Management District d[id] not include the proposed development"—it was beyond the County's services area and "we're not permitted by the State of Florida to serve water to this proposed development at this time without modifying that permit." (*Id.* at 53).

The consumptive use permit would accommodate the needs "based on projections of growth and development and water demand" within the County's urban areas; the County had standards that apply to the service areas within the urban boundary. (*Id.* at 54). He explained that "the consumptive use permit would suggest

[that] if we're providing water somewhere else, we may not have enough water for the areas in which it was originally planned." (*Id.*). Under the comprehensive planning requirements, the County was required to evaluate the impact of new development on existing customers and "shall not expand if we cannot continue to provide th[e] minimum levels of service." (*Id.* at 56). Any new developments outside the urban area must "continue to rely primarily on many individual wells" and "shall not be designed or constructed with central water or sewer systems," with the cost to extend waterlines to new developments to be borne by the development. (*Id.*). The projections for the ten-year water supply facilities for potable water would require that the River Cross project "would have to be located within the urban boundary for [the County] to provide central water service"; the sanitary sewer element would mirror these issues and requirements. (*Id.*). He also identified issues with whether pumps were sufficient, the impact on the County's capital project plans, the review of existing agreements between the County and other utility providers, and the impact to existing customers. (*Id.* at 57).

In the rural area developments, the wastewater was primarily served by septic tanks and not constructed or designed with central water and sewer. (*Id.* at 58). As Mr. Edwards made clear to the BCC:

> Conclusions here are largely the same. [The development] needs to be within the urban boundary and we'd need to update our wastewater

plan. Again, the same types of evaluations would need to be conducted. We don't have this information yet. It was not included with the application. So our conclusions were that the application was incomplete. It doesn't show us compliance with the comprehensive plan policies that we just discussed.

(*Id.*).

### E. *Procedural History in United States District Court*

Following denial of the proposal by the BCC, River Cross filed suit in this Court against Seminole County on October 2, 2018, alleging a violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 and 361, arising out of the Board of County Commissioners' denial of the application based on the 75 multi-family units of "affordable housing" it had added to its proposal. (Doc. 1). The County moved to dismiss the Complaint on October 24, 2018 (Doc. 8), which the Court granted in part on February 3, 2019. (Doc. 18). On January 31, 2020 the parties moved to administratively close the case while River Cross submitted a "land swap" settlement proposal to the County, which it needed to consider through the administrative process. (Doc. 50). [26]

---

[26] On April 1, 2021, Mr. Dorworth emailed a subsequent proposal from River Cross to the County attorney seeking approval for development of "1338 residential units and 200,000 square feet of space for offices, stores, and restaurants." *Dorworth Pitches New Proposal for River Cross Property*, ORLANDO SENTINEL, April 7, 2021. However, the County Commissioners voted against this modified proposal two weeks later. *Seminole Commissioners Reject Dorworth's Latest River Cross Proposal After Closed-Door Meeting*, ORLANDO SENTINEL, April 21, 2021.

While the case was administratively closed, Seminole County informed the Court[27] that River Cross had filed, on May 19, 2020, a related case in the Circuit Court of the Eighteenth Judicial Circuit in and for Seminole County, styled *River Cross Land Company, LLC and Christopher E. Dorworth v. Seminole County*, Case No. 2020-CA-001202. In the complaint filed in the state court docket, River Cross seeks a declaratory judgment invalidating the provisions implementing and enforcing the "rural area" and "boundary line" in the Seminole County Charter, arguing they are unconstitutionally vague. (*Id.*).[28]

On August 14, 2020 the parties jointly moved to lift the administrative stay (Doc. 56) and have the Court decide the parties' *Daubert* Motion, Motions for Summary Judgment, and Motion *In Limine* (Docs. 34, 35, 36, 44) without any additional briefing of the issues on the FHA segregative-effect claim. The Court initially ordered the parties to show cause why the administrative stay in the case should not be extended while the state court case proceeded in order to conserve judicial resources and avoid inconsistent outcomes regarding the validity of Seminole County's Charter as it relates to enforcement of the "Boundary Line." (Doc. 57). On closer inspection and with the benefit of the parties' Responses to the

---

[27] *See* Notice of Related Cases (Doc. 55).
[28] The County moved to dismiss the claims in the state case and the matter is set for hearing on July 7, 2021. *See* https://courtrecords.seminoleclerk.org/ (visited on June 1, 2021).

Order to Show Cause, the Court found that abstention did not apply and there was not a likelihood of inconsistent outcomes; therefore, the stay would be lifted and the case reopened. On January 26, 2021, the Court granted the Joint Motion to Reopen and Lift Stay (Doc. 56), set the case for trial, and reactivated the parties' motions. (Doc. 60).

### F. *FHA Claim of River Cross*

The remaining single claim[29] River Cross asserts in the case is that the County's actions in denying its application for an amendment to the Comprehensive Plan and Future Land Use Map and "implementing and enforcing" the Boundary Line "reinforces" or "perpetuates" a segregative effect in violation of the Fair Housing Act, 42 U.S.C. §§ 3604 and 3613. (Doc. 30 at 8).[30] Section 804(a) of the FHA makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable

---

[29] River Cross asserts separate counts for money damages and injunctive relief under the same provision of the FHA and the two counts are based on the same conduct. (Doc. 1 at 6-10).

[30] River Cross specifically alleged in the Complaint that the County violated the FHA by denying its application for: (1) an "amendment to Seminole County's Comprehensive Plan to amend the Rural Boundary Line to remove the Property from the East Rural Area"; (2) an amendment to the County's Future Land Use Map "to remove the Property from the Rural Boundary Line," and (3) a rezoning of the proposed site from Rural-5 to Planned Development zoning, actions which "perpetuate[] a history of residential racial segregation in Seminole County" and injure River Cross. (Doc. 1 ¶¶ 18, 20, 22, 29, 31, 33, 37, 38). To the extent River Cross argues that the County did not rely on the Comprehensive Plan to deny its application and can only support denial based on Section 5.2B of the Seminole County Home Rule Charter (see Doc. 45 at 6), the argument is not well-taken, given River Cross' allegations in the Complaint (Doc. 1).

or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a); *see also* 42 U.S.C. § 3613 (providing a private right of action for an "aggrieved person" under the FHA).

## III.   STANDARDS OF REVIEW

### A. *Daubert* and Federal Rule of Evidence 702

Rule 702 of the Federal Rules of Evidence controls the admission of expert testimony. It allows an expert to testify in a case, provided that "scientific, technical, or other specialized knowledge will assist the trier of fact." Fed. R. Evid. 702. Additionally, the expert must be qualified by "knowledge, skill, experience, training, or education" and may testify to an opinion if "(1) the testimony is based upon sufficient facts or data"' (2) "the testimony is the product of reliable principles and methods"; and (3) "the witness has applied the principles and methods reliably to the facts of the case." *Id.*

Rule 702 compels courts to perform a "gatekeeping" function—specifically, to determine whether the proffered expert testimony is reliable and relevant. *Daubert v. Merrell Dow Pharms*., Inc., 509 U.S. 579, 589 n.7, 590-91 (1993). "Expert evidence can be both powerful and quite misleading because of the [jury's] difficulty in evaluating it." *Id.* at 595 (citation and internal quotation marks omitted). The Eleventh Circuit has highlighted the importance of *Daubert*'s gatekeeping function,

emphasizing that courts must carefully judge the intellectual rigor employed by an expert because expert witnesses are free to opine without firsthand knowledge and rely on inadmissible hearsay. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004); *see United States v. Ala. Power Co.*, 730 F.3d 1278, 1282 (11th Cir. 2013).

The Eleventh Circuit has set forth "a rigorous three-part inquiry" to be used in determining the admissibility of expert testimony. *Frazier*, 387 F.3d at 1260. For expert testimony to be admissible, a district court must determine that:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)); *Rink v Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005). The Supreme Court has emphasized that "[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful" because "scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes." *Daubert*, 509 U.S. at 591 (citations omitted). "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Ev*Id.* 401;

*McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (noting the testimony must logically advance a material part of the case to be relevant and "there is no fit where a large analytical leap must be made between the facts and the opinion."). The burden of laying the proper foundation for the admission of expert testimony rests with the party offering the expert. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2005); *Frazier*, 387 F.3d at 1260. The admissibility of the expert must be established by a preponderance of the evidence. *McCorvey,* 298 F.3d at 1256.

### B. Summary Judgment Standard

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant must satisfy this initial burden by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In response, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of [its] pleading, but must set forth specific facts showing that there is a

genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 256 (1986) (citation omitted). The movant is entitled to summary judgment where "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex,* 477 U.S. at 323. In deciding whether to grant summary judgment, the Court resolves all ambiguities and draws all permissible factual inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255; *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir. 2003) (citation omitted).

Federal courts cannot weigh credibility at the summary judgment stage. *See Feliciano v. City of Mia. Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) ("Even if a district court believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices." (citation and internal quotation marks omitted)). Therefore, the Court will "make no credibility determinations or choose between conflicting testimony, but instead [will] accept [the non-moving party's] version of the facts drawing all justifiable inferences in [the non-movant's] favor." *Burnette v. Taylor*, 533 F.3d 1325, 1330 (11th Cir. 2008). Notwithstanding this inference, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the

court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996).

"Cross motions for summary judgment do not change the standard." *Perez–Santiago v. Volusia Cnty.*, No. 6:08–cv–1868–Orl–28KRS, 2010 WL 917872, *2 (M.D. Fla. Mar. 11, 2010) (internal citations omitted). "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" *Id.* (internal quotations and citations omitted). "Even where the parties file cross motions pursuant to Rule 56, summary judgment is inappropriate if disputes remain as to material facts." *Id.*

### C.    Standing to Sue under the Fair Housing Act

The Court must first address whether River Cross has standing to assert an FHA claim against the County for denial of its proposal to build "affordable housing." The County argues that, although River Cross claims that it would provide 15% of the units as "affordable housing," River Cross concedes that approval from Florida Housing Finance Corporation is not guaranteed; and they are unlikely to be included as "affordable housing units" in the development because they would revert to market rate if approval was not received from the Florida Housing Finance Corporation within thirty days of receipt of the certificate of occupancy. The County also argues that there was no expert or other evidence of the demographics of the

people who would live in the proposed development to indicate their race. Thus, the County argues, without any evidence that the River Cross Project would actually alleviate a segregative effect, River Cross cannot sustain the lawsuit. (Doc. 35 at 21 (citing *Hallmark Developers*, 386 F. Supp. 2d at 1383)).[31]

Other courts have held that, under the express terms of the Fair Housing Act, any person or entity, including a developer, "aggrieved" by an allegedly unlawful practice is authorized to bring suit under the FHA. *See, e.g., Hallmark Devs., Inc. v. Fulton Cty., Georgia*, 386 F. Supp. 2d 1369, 1381 (N.D. Ga. 2005) (citing 42 U.S.C.A. § 3610(a)(1)(A)), *aff'd,* 466 F.3d 1276 (11th Cir. 2006); *see also Baytree of Inverrary Realty Partners v. City of Lauderhill*, 873 F.2d 1407, 1408–1409 (11th Cir. 1989) (holding that non-minority developers had standing to assert their own right to challenge allegedly racially motivated adverse zoning decisions by local governmental officials under the FHA). The definition of "aggrieved person" includes anyone who "claims to have been injured by a discriminatory housing practice." *Id.* (citing 42 U.S.C.A. § 3602(i)(1)). "Under long-established precedent, standing under the Fair Housing Act is not limited by prudential concerns but is

---

[31] Federal courts also have "an independent obligation to assure that standing exists." *Summers v. Earth Island Inst*., 555 U.S. 488, 499 (2009); *see City of Miami Gardens v. Wells Fargo & Co.*, 931 F.3d 1274, 1283 (11th Cir. 2019)(affirming summary judgment where standing to sustain a claim under the FHA was a contested issue and required evidence rather than allegations to withstand summary judgment).

satisfied by the minimum constitutional 'case or controversy' requirement of Article III." *Id.* (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 372, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 103 n. 9, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979)). A plaintiff need only show: (1) an actual or threatened injury; (2) that is caused by or fairly can be traced to the defendant's challenged action; and (3) that is likely to be redressed by a favorable court decision. *Jackson v. Okaloosa County, Fla.*, 21 F.3d 1531, 1537 (11th Cir. 1994)(citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).

However, a developer or property owner will not have standing to sue under the FHA if the developer alleges a purely economic injury without any specific plans to build a development that will demonstrably house minority tenants. In *Nasser v. City of Homewood*, the Eleventh Circuit considered the Fair Housing Act claims of the owner of nine acres that were rezoned from multi-family to single-family residential after it was incorporated into the city limits by an act of the state legislature. 671 F.2d 432, 437–438 (11th Cir. 1982). The property owners had previously contracted with a developer to construct a multi-family housing complex, and the developer had "looked into the possibility of having the said real property developed under some program supported by the Housing and Urban Development

Department" with the intent to "make some units available to low- and moderate-income families through rent subsidies"; however, the plans did not progress beyond the "inquiry stage." *Id.* at 435. Because there was no indication that the previous plans were viable three years later, at the time the property was rezoned by the city, the Eleventh Circuit held that the property owner lacked standing under the FHA. The court noted unrebutted testimony from a city commissioner that "at no time during [the owner's] several appearances before [the City] authorities, however, did [he] state or suggest that his purpose . . . was to build a multi-family project for the use and benefit of low income or minority groups. . . . [He] or his attorney represented that they wished to build 'an exclusive-high rent apartment complex of the type and sort which would only appeal to the upper income bracket." *Id.*[32]

The Eleventh Circuit also noted that there was no evidence that the multi-family project was "in any way affected by or related to racial or other minority interests." *Id.* The Court criticized the "apparent deficiency in the plaintiffs' evidence," and, more strongly, the plaintiffs' "implicit assumption that 'low and moderate-income housing' is synonymous with housing for minorities protected by the Fair Housing Act" *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 494-95 & n. 5, 502

---

[32] Regarding the latest proposal from River Cross sent to the County on April 1, 2021, for 1338 residential units and less commercial space, Mr. Dorworth said, "I think it will be a very high-end and beautiful community. . . . But it will be a far cry from what we proposed before." *Dorworth Pitches New Proposal for River Cross Property*, ORLANDO SENTINEL, April 7, 2021.

(1975)). Accordingly, the court found that the developer lacked standing under the FHA because there was "a complete lack of showing" that there was a specific plan to develop minority housing. *Id.* ("The plaintiffs do not suggest that any 1979 'exclusive-high rent' project had any connection to minority interests."). The Eleventh Circuit explained its decision on standing:

> There is no indication that the [Supreme] Court intended to extend standing, beyond the facts before it, to plaintiffs *who show no more than an economic interest which is not somehow affected by a racial interest.* There is no suggestion, either in the Act or its legislative history, that Congress intended to entrust the enforcement of the Fair Housing Act to such plaintiffs. . . . This does not mean that only non-economic interests may be protected by the Act. *See, e.g., Williams v. Miller*, 460 F.Supp. 761 (N.D.Ill.1978), *aff'd mem.*, 614 F.2d 775 (7th Cir. 1979); *cf. Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) (standing to assert constitutional rights of third parties). *See generally Village of Arlington Heights v. Metropolitan Housing Devel. Corp.*, 429 U.S. at 263, 97 S.Ct. at 562, 50 L.Ed.2d at 463. No economic interest justifying such treatment has been identified or shown in this case. We therefore hold that the plaintiffs do not have standing under s. 812 of the Fair Housing Act, 42 U.S.C. s. 3612.

*Id.* at 437-38 (emphasis added; citation omitted).

The County cites *Hallmark Developers, Inc. v. Fulton County, Georgia*, in which the district court granted summary judgment on the developer's FHA claim, holding that the county's denial of the zoning application did not have a segregative effect because there was no evidence that minorities would move into the new development, such as through wait-lists or other evidence of those seeking the

housing. 386 F. Supp. 2d 1369, 1383 (N.D. Ga. 2005), *aff'd, Hallmark Developers, Inc. v. Fulton Cty., Ga*., 466 F.3d 1276 (11th Cir. 2006). Thus, the effect on minority representation of the proposed development would be "inherently speculative." *Id.*

As the County points out, the evidence introduced by River Cross does not include any information about the demographics of the individuals who would be expected to move into the River Cross Project. Without evidence establishing that minorities would reside in the River Cross Project, the County argues, River Cross cannot state a prima facie case that the removal of the Property from the Rural Area would increase the minority population in the area. As the Eleventh Circuit explained in *Nasser,* the Court will not make the "implicit assumption that 'low and moderate-income housing' is synonymous with housing for minorities protected by the Fair Housing Act," 671 F.2d at 435. This is especially true in light of the County's uncontroverted evidence that there is a lack of transportation and jobs near the Project, and there is no evidence of the demand by minorities for affordable housing in the isolated rural, eastern area of the County where the population is actually decreasing.

In response, River Cross argues that *Hallmark Development* is distinguishable because it was primarily about a disparate impact claim, and the segregative effect claim failed because the area was predominately African American so the absence

of the proposed development would have no "appreciable impact." River Cross cites

two cases in which overwhelmingly white cities (at the 98%-99% level) were sued

for zoning denials perpetuating segregation when they blocked construction of low-

cost housing in rigidly segregated areas. (Doc. 42 at 14 (citing *United States v. City

of Black Jack*, 508 F.2d 1179 (8th Cir. 1974) (98% white) and *Kennedy Park Homes

Assoc., Inc. v. City of Lackawanna*, 436 F.2d 108 (2d Cir. 1970) (98.9% of non-white

citizens lived in First Ward). River Cross argues that, because nothing else in the

County's Rural Area offers the level of "intense development" proposed for its

Project, denial of the project impedes the ability to end racial segregation. River

Cross contends that "allowing for development will certainly alleviate the

segregative housing pattern, especially considering that the Property is within a ten-

mile radius of the University of Central Florida." (Doc. 42 at 16).

River Cross further argues that a genuine issue of material fact exists as to

whether approval of the River Cross Project will alleviate the "segregated housing

pattern" in the County's Rural Area based on Dr. Cowan's statistical evidence

demonstrating that a segregated housing pattern exists between the Rural Area and

Urban Area, "when the only discernable difference between the two areas is the

County's land use regulations"; thus, approval of the River Cross Project will bring

infrastructure and higher-density development to the Rural Area to alleviate the

segregated housing pattern. In other words, River Cross argues that it is not required to present *any* evidence to establish that *minorities* in particular will move to the property simply because it can allegedly show that the population in the urban area west of the Boundary Line is more diverse.

In *Hallmark Developers*, 466 F.3d at 1287, the Eleventh Circuit discussed some of the leading segregative effect cases that River Cross relies on, all of which did require evidence that there was a demand by minorities for the proposed housing, either through a waiting list for affordable housing or a shortage of housing for the minority population, before considering whether the municipalities' denials perpetuated segregation. *See, e.g., Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926, 929 (2d Cir.) (considering impact of housing shortage on the "disproportionate percentage" of minorities on the waiting list who qualify for federally subsidized housing), *aff'd*, 488 U.S. 15, 18 (1988) (per curiam); *Arlington Heights*, 558 F.2d at 1288 (considering housing intended for those who qualified for federal subsidies); *City of Black Jack*, 508 F.2d at 1186 (with regard to housing intended for those within a certain income range, there "was ample proof that many blacks would live in the development").

In *Arlington Heights*, the Seventh Circuit concluded that construction of the proposed development "would be a significant step toward integrating the

community" and, because the proposed project would have to be racially integrated in order to qualify for federal subsidies, the Village's action in preventing the project from being built had the effect of perpetuating segregation. *Arlington Heights*, 558 F.2d at 1288. The development's racial make-up would reflect the income-eligible population in the overall metropolitan area which was forty percent black. *Id.*[33]

In this case, River Cross has shown "no more than an economic interest" which is not "somehow affected by a racial interest." *See Nasser*, 671 F.2d at 435. The overwhelming basis of the River Cross proposal is 1.5 million square feet of commercial space, 870 single family homes and townhouses and 425 apartments—all at market rates. The 75 "affordable" multi-family units (15% of 500 total) were proposed at the last minute "for information only," without any actual information regarding the qualifying income levels or racial make-up of the residents to be served, as the County staff noted. The River Cross "affordable housing" proposal in this case is distinguishable from the developments in landmark segregative-effect

---

[33] On remand in the case, the concurring judge noted the overwhelming percentage of white residents was by design: "Arlington Heights is a community of substantial size . . .[yet] housing there is presently almost totally confined to white persons. The substantial percentage of minority persons in the whole metropolitan community and the fact that minority persons are employed in Arlington Heights render it improbable that existing housing segregation there can represent free choice among persons who might reasonably consider living there. Zoning is appropriate for regulating the location of land use within a community. . . [but] it is not appropriate for total exclusion." *Metropolitan Housing Development Corp. v. Village of Arlington Heights*, 558 F.2d 1283, 1296 (7th Cir. 1977) (Fairchild, C.J., concurring).

cases which unquestionably satisfied the "race-based" element of harm because those plaintiffs proposed federally-subsidized projects that had racial integration as a goal with specific criteria and objectives to accomplish it. *See, e.g., Arlington Heights, see also* Doc. 35-15 Fishkind at ¶ 29 (opining that Dr. Cowan's expert opinion "is devoid of any information related to the income levels of the minorities allegedly segregated from the rural area.")).

Other courts have held that the FHA does not apply in cases in which the plaintiffs allege damage arising out of a failed commercial venture—even if the property itself fits the definition of a "dwelling" under the FHA—where they had no intention of residing in the property and were not suing on behalf of protected class members who would reside there. *See, e.g., Shaikh v. City of Chicago*, No. 00-C-4235, 2001 WL 123784, at *4 (N.D. Ill. Feb. 13, 2001) (minority plaintiff had no standing under FHA to sue for city's actions opposing his purchase of apartment building as an investment); *Patel v. Holley House Motels*, 483 F.Supp. 374, 381 (S.D. Ala. 1979) (holding that minority plaintiffs seeking to purchase motel had no FHA claim because they sought to purchase the motel as a commercial venture and did not intend to reside there); *Weingarten Realty Investors v. Albertson's, Inc.*, 66 F.Supp.2d 825, 849 (S.D. Tex. 1999) (FHA does not extend to sale of commercial real estate). The same principle applies in this case where River Cross has not alleged

any information about the race or national origin of the prospective occupants or protected class who would occupy the 75 "affordable housing" units and—from the perspective of a non-minority developer such as Plaintiff River Cross—the project is nothing more than a commercial venture.

In addition, with no guarantee that the conditional "affordable housing" would be approved by a third-party within thirty days after occupancy, and with no information regarding the racial composition of the prospective residents who would reside in the development, River Cross cannot show that the County's denial of its application perpetuates a segregative effect. *See Ave. 6E Investments, LLC v. City of Yuma, Ariz.*, No. 2:09-CV-00297 JWS, 2013 WL 2455928, at *7 (D. Ariz. June 5, 2013), *rev'd on other grounds*, 818 F.3d 493, 513 (9th Cir. 2016) (affirming district court grant of summary judgment on segregative effect claim because the "statistics showed that the denial of the zoning application would not have a significant segregative effect on the neighborhood," but reversing on disparate impact). Even if River Cross had produced evidence of prospective occupants' racial demographics for the affordable housing units in other parts of Seminole County, tied to income levels or waiting lists at similar housing, there is virtually no chance the Florida Finance Corporation would approve the project. As Ms. Frederick, the County's affordable-housing specialist explained, the location of the River Cross project, far

from transportation and jobs, would make it extremely unattractive and unlikely to receive approval from the competitive process of the Florida Housing Finance Corporation. (Doc. 35-2 at 46)("a good score" for housing costs and transportation costs "should not exceed 45 to 50" and the score for River Cross' proposed site was a high number "between 78 and 87 percent of any household in this area's income"). The end result, if the affordable housing application was not approved would be that the 75 "affordable" units would then automatically "revert" to the market rate one month after the project opened. Accordingly, River Cross lacks standing to assert a claim under the Fair Housing Act.

### D. Elements of the Segregative Effect Claim

Assuming *arguendo* that River Cross could show it has standing to sue under the FHA—in spite of its failure to assert a "racial interest" or race-based connection to the harm it alleges—River Cross's segregative effect claim would fail because it cannot show that the County's enforcement of the Rural Boundary to prevent urban sprawl actually "caused," "reinforces," or "perpetuates" a "segregative effect."

In filing an FHA action, "[a] plaintiff can demonstrate a discriminatory effect in two ways: it can demonstrate that [a defendant's] decision has a segregative effect or that it makes housing options significantly more restrictive for members of a protected group than for persons outside that group." *Oviedo Town Center II, LLLP*

*v. City of Oviedo, Fla.*, 759 F. App'x 828, 833 (11th Cir. 2018) (quoting *Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1286 (11th Cir. 2006)). Segregative-effect claims focus on how a challenged action affects residential segregation in the local community, as opposed to "disparate impact" claims which focus on the harm done to a racial minority or protected group. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.,* 576 U.S. 519, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015).

Consistent with the case law since the 1970s, the United States Department of Housing and Urban Development in 2013 formally codified segregative-effect claims in which a policy or practice may have a discriminatory effect and "harm the community generally by creating, increasing, reinforcing, or perpetuating segregated housing patterns." *See* Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11460-61, 11468-69 (Feb. 15, 2013) (promulgating 24 C.F.R. § 100.500(a)) (the "2013 HUD Regulation") (noting that "the perpetuation of segregation theory of liability has been utilized by private developers and others to challenge practices that frustrated affordable housing development in nearly all-white communities and thus has aided attempts to promote integration [citing cases]").

The 2013 HUD Regulation incorporated the burden-shifting analysis applied by the circuit courts considering FHA discriminatory-effect cases, including segregative-effect cases in which municipalities were accused of using their land-use powers to block non-profit integrated housing developments in certain neighborhoods, towns and villages which were virtually all-white communities. *See, e.g., Huntington*, 844 F.2d at 937-41 (holding that New York City suburban town violated the FHA by refusing to rezone neighborhood which was 98% white for subsidized housing project, confining project to largely minority urban renewal area); *Arlington Hts.*, 558 F.2d at 1286-87, 1291 (holding that suburban village, 99% white, in Chicago metropolitan area that had "a significant percentage of black people" violated the FHA by denying zoning change for non-profit developer to build subsidized apartments serving minority tenants); *City of Black Jack*, 508 F.2d at 1188 (holding that adoption of zoning ordinance prohibiting construction of affordable housing townhouses in 99% white suburban city outside St. Louis, which was 41% black, violated FHA); *see also Dews v. Town of Sunnyvale*, 109 F. Supp. 2d 526, 567-68 (N.D. Tex. 2000) (holding that ban on apartments and less costly single-family housing by small town, 97% white, in Dallas suburbs (2,228 residents) "perpetuates segregation"); *cf. Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 494-96 (9th Cir. 2016) (affirming summary judgment on segregative-

effect claim brought by developer of predominately Hispanic development to be built near a "white-majority area" where Hispanics constituted 55% of population and the white population had fallen from 75% to at most 65%, which showed that Hispanics were integrating into the area).

Under the 2013 HUD Regulation, all discriminatory-effect cases apply a three-step burden shifting analysis. 24 C.F.R. § 100.500(c) (2019). First, the plaintiff has the initial burden of establishing a prima facie case by proving that "a challenged practice caused or predictably will cause a discriminatory effect." *Id.* One commentator has described this step as (1) identifying a particular practice of the defendant to challenge; (2) showing through statistical evidence that this practice exacerbates segregation in the relevant community to a sufficiently large degree; and (3) proving that the defendant's challenged practice actually caused this segregative effect. *See* Robert G. Schwemm, *Segregative-Effect Claims Under the Fair Housing Act*, 20 N.Y.U. J. LEGIS. & PUB. POL'Y 709, 712-13 & n. 16 (2017) (citing Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 Fed. Reg. 11,460, 11,468-69 (Feb. 15, 2013); *Inclusive Cmtys.*, 135 S. Ct. at 2523-24); *cf. Oviedo Town Center*, 759 F. App'x 828, 834 ("This theory of disparate impact liability, however, would create substantial difficulties if applied too expansively. . . [and] undeniably would overburden cities and developers.").

If the plaintiff proves a prima facie case under the 2013 HUD Regulation, the burden shifts to the defendant to prove that its "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* Finally, if the defendant satisfies this burden, the plaintiff is required to prove that the defendant's interest in "the challenged practice could be served by another practice that has a less discriminatory effect." *Id.*

Thus, to survive summary judgment on a segregative effect claim based on the 2013 HUD Regulation, a plaintiff must establish a prima facie case showing: 1) a segregated housing pattern based on race within a specific community based on statistics and 2) that defendant's practice "caused" or "perpetuated" the segregation. 24 C.F.R. § 100.500(a)(2013 HUD Reg.); Implementation of the Fair Housing Act's Discriminatory Effects Standard, 78 FR 11460-01.[34]

---

[34] Following the Supreme Court's decision in *Inclusive Communities*, HUD began the notice and comment process in 2017 to revise the 2013 HUD Regulation governing discriminatory effect claims, 24 C.F.R. § 100.500, *see* 85 Fed. Reg. 60,289. The final version of the new regulation was due to become effective on October 26, 2020. *Id.* However, on September 24, 2020, in *Massachusetts Fair Housing Center v. United States Department of Housing and Urban Development*, the District Court of Massachusetts entered a nationwide preliminary injunction to postpone the effective date of the revised 2020 HUD Regulation. 496 F.Supp.3d 600 (D. Mass. Oct. 25, 2020), *appeal dismissed*, No. 21-1003 (1st Cir. Feb. 18, 2021). Under the 2020 version of the Regulation, "the defendant may establish that the plaintiff has failed to meet the burden of proof to establish a discriminatory effects claim" by demonstrating the defendant's policy "is reasonably necessary to comply with . . . a federal, state, or local law; or controlling court opinions, regulatory or administrative requirements, or government guidance." *See* 85 Fed. Reg. 60,289.

In 2015, the Supreme Court decided the case of *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.,* 576 U.S. 519, 135 S.Ct. 2507, 192 L.Ed.2d 514 (2015), which modified the level of causation the plaintiff is required to show. The thrust of the majority opinion was on the viability of the "disparate impact" theory of liability, and the opinion made only a passing reference to the segregative-effect theory, even though it cited with approval several influential circuit court cases that had applied the segregative effect theory in the context of discriminatory zoning rules in overwhelmingly white towns and neighborhoods. The Court held:

> Recognition of disparate-impact claims is consistent with the FHA's central purpose. The FHA, like Title VII and the ADEA, was enacted to eradicate discriminatory practices within a sector of our Nation's economy. See 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States"); H.R. Rep., at 15 (explaining the FHA "provides a clear national policy against discrimination in housing").
>
> These unlawful practices include zoning laws and other housing restrictions that function unfairly to exclude minorities from certain neighborhoods without any sufficient justification. Suits targeting such practices reside at the heartland of disparate-impact liability. *See, e.g., Huntington,* 488 U.S., at 16–18, 109 S.Ct. 276 (invalidating zoning law preventing construction of multifamily rental units); *Black Jack,* 508 F.2d at 1182–1188 (invalidating ordinance prohibiting construction of new multifamily dwellings); *Greater New Orleans Fair Housing Action Center v. St. Bernard Parish,* 641 F.Supp.2d 563, 569, 577–578 (E.D. La. 2009) (invalidating post-Hurricane Katrina ordinance restricting the rental of housing units to only "'blood relative[s]'" in an area of the city that was 88.3% white and 7.6% black). . . . The

availability of disparate-impact liability, furthermore, has allowed private developers to vindicate the FHA's objectives and to protect their property rights by stopping municipalities from enforcing arbitrary and, in practice, discriminatory ordinances barring the construction of certain types of housing units. *See, e.g., Huntington, supra*, at 18, 109 S.Ct. 276. Recognition of disparate-impact liability under the FHA also plays a role in uncovering discriminatory intent:  It permits plaintiffs to counteract unconscious prejudices and disguised animus that escape easy classification as disparate treatment. In this way disparate-impact liability may prevent segregated housing patterns that might otherwise result from covert and illicit stereotyping.

But disparate-impact liability has always been properly limited in key respects that avoid the serious constitutional questions that might arise under the FHA, for instance, *if such liability were imposed based solely on a showing of a statistical disparity.* Disparate-impact liability mandates the "removal of artificial, arbitrary, and unnecessary barriers," *not the displacement of valid governmental policies. Griggs, supra*, at 431, 91 S.Ct. 849. The FHA is not an instrument to force housing authorities to reorder their priorities. Rather, the FHA aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects or perpetuating segregation.

*Inclusive Cmtys.*, 135 S.Ct. at 2521-22 (emphasis added). While the Supreme

Court's decision did not rely on giving deference to HUD's 2013 regulation, it did

cite the 2013 HUD Regulation and HUD's commentary on it with apparent approval

several times, as well as pointing to the disparate impact theory's "long provenance."

*See* Schwemm, *supra,* at 728 (citing *Inclusive Cmtys.*, 135 S. Ct. at 2514-15, 2522,

2323). "All of these points support not only the disparate-impact theory, but the

segregative-effect theory as well." *Id.*

Equally applicable to segregative effect and disparate impact claims is the language in *Inclusive Communities* setting "safeguards" for discriminatory-effect claims to protect potential defendants against "abusive" claims. An "important and appropriate means of ensuring" that disparate-impact liability is "properly limited" is to give the authorizing body the opportunity to explain "the valid interest served by their policies."[35] *Id.* at 2522. The Court explained the importance of specifically allowing zoning officials the latitude to make decisions affecting a community's "quality of life":

> It would be paradoxical to construe the FHA to impose onerous costs on actors who encourage revitalizing dilapidated housing in our Nation's cities merely because some other priority might seem preferable. Entrepreneurs must be given latitude to consider market factors. Zoning officials, moreover, must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture). These factors contribute to a community's quality of life and are legitimate concerns for housing authorities. The FHA does not decree a particular vision of urban development; and it does not put housing authorities and private developers in a double bind of liability, subject to suit whether they choose to rejuvenate a city core or to promote new low-income housing in suburban communities. As HUD itself recognized in its recent rulemaking, disparate-impact liability

---

[35] The Supreme Court noted that the Title VII analogy "may not transfer exactly to the fair-housing context, but the comparison suffices for present purposes." *Inclusive Communities,* 135 S.Ct. at 2523. It transfers even less so to the segregative-effect aspect of a FHA claim. *See* Schwemm, *supra,* at 714 ("[U]nlike disparate-impact, the segregative-effect theory has no clear analog in Title VII law"); *id.* at 736 ("[T]he issue of what, if anything, the segregative-effect theory *adds* to potential FHA liability remains open for future litigation.").

"does not mandate that affordable housing be located in neighborhoods with any particular characteristic." 78 Fed.Reg. 11476.

In a similar vein, a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity. A *robust causality requirement* ensures that "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact" and thus protects defendants from being held liable for racial disparities they did not create. *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 653, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k). Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and "would almost inexorably lead" governmental or private entities to use "numerical quotas," and serious constitutional questions then could arise. 490 U.S. at 653, 109 S.Ct. 2115.

The litigation at issue here provides an example. From the standpoint of determining advantage or disadvantage to racial minorities, it seems difficult to say as a general matter that a decision to build low-income housing in a blighted inner-city neighborhood instead of a suburb is discriminatory, or vice versa. If those sorts of judgments are subject to challenge without adequate safeguards, then there is a danger that potential defendants may adopt racial quotas—a circumstance that itself raises serious constitutional concerns. . . . A plaintiff who fails . . . . produce statistical evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact.

*Id.* at 2523. The Supreme Court further cautioned that the "safeguard" of requiring a plaintiff to produce statistical evidence demonstrating a causal connection is "necessary to protect potential defendants" against abusive claims lest the "specter of litigation" prevent governmental entities "from achieving legitimate objectives, such as ensuring compliance with health and safety codes." *Id.* Justice Kennedy, in the penultimate paragraph, discusses the FHA's role "in our Nation's continuing

struggle against racial isolation [and in] striving to achieve our 'historic commitment to creating an integrated society'" and acknowledged that "many cities have become more diverse" since the passage of the FHA in 1968, yet the FHA has a "continuing role in moving the Nation toward a more integrated society." *Id.* at 2525-26.

The Fifth Circuit more recently applied the Supreme Court's "safeguards incorporate[d] into the burden-shifting framework" to a non-profit group's segregative effect claim against a private landlord who refused to participate in a voluntary HUD-subsidized voucher program. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890 (5th Cir. 2019). The court affirmed dismissal of the plaintiff's FHA claims, finding the claims did not satisfy the Supreme Court's burden-shifting analysis from *Inclusive Communities*, and had failed to detail how the no-voucher policy "caused the racial disparity" across census tracts. *Id*. at 903, 907.

## IV.   EXPERT TESTIMONY AND OPINIONS

The County moves to exclude the opinions and testimony of Dr. Charles D. Cowan, the expert witness for River Cross, arguing that he should not be permitted to testify about whether the implementation and enforcement of the Rural Boundary Line perpetuates a segregative effect, based upon *Daubert* and the requirements of Federal Rule of Evidence 702.

The Cowan Rebuttal Report, for the first time, discusses segregative effect—in response to the Report of the County's expert, Dr. Fishkind, who opined that Dr. Cowan's (adopted) Initial Report[36] "fails to prove that the implementation and enforcement of the Boundary Line has had a segregative effect on minorities." (Doc. 34-4 at 2). Dr. Cowan's Rebuttal Report contained three specific findings: 1) while both the rural areas and urban areas in Seminole County were becoming more diverse (that is, they had proportionately fewer whites than minorities over time), the change is faster in the urban areas; 2) a causation analysis is not necessary; and 3) an analysis relating to whether the relief sought by River Cross would ameliorate the segregative effect is not necessary. (*Id.* at 3).

The County contends that Dr. Cowan's opinions fail to meet the standard required by *Daubert* because he fails to provide sufficient statistics to show that a segregative effect on minorities exists due to the Boundary Line or, if it does, that any policies or decisions of the County are causing it. (Doc. 34). Dr. Cowan's testimony should be excluded, the County argues, because it has no probative value and will only confuse the jury since he admits that he cannot provide an opinion on

---

[36] Dr. Stephanie Boone drafted the initial report, entitled "Rural Boundary Impact Report," for Analytic Focus, LLC which Dr. Cowan adopted in its entirety and affirmed he "would not deviate from" its findings and conclusions. (Doc. 34-2; Doc. 36-7 & 52-1 (same unredacted copies of the "Initial Report"); Doc. 34-5 (Cowan Dep.). Dr. Cowan personally prepared the Rebuttal Report. (Doc. 34-4 ; *see* Doc. 36-4 (Am. Discl. Expert Rep.)).

causation, and the statistical evidence on which he opines is not "segregation," but merely differences in the rates that the minority populations are changing the urban and rural areas. The County argues that such evidence will not assist the trier of fact in determining whether the County's decision "reinforces" or "perpetuates" segregation.

River Cross argues that Dr. Cowan is an expert who is qualified to perform statistical analysis and he should be permitted to testify that a "segregated housing pattern exists" in the rural area,[37] which will assist the trier of fact in "determin[ing] whether the Rural Boundary Line, the County's denial of River Cross' application, and/or some other factor is perpetuating the segregated housing." In his report, Dr. Cowan concedes that the rural area has become "more diverse over time,"[38] and less segregated. He concludes, however, that "the Boundary Line appears to slow the growth of minority populations in the rural areas." (*Id.* at 6). At his deposition, Dr. Cowan testified that he defines "segregative effect" as "fewer of one group than another," or that "there's different percentages [of minorities] on each side of [the Rural Boundary Line] and that they are growing or not growing." (Doc. 34-5 at 87,

---

[37] River Cross argues 'the precise relief requested' by the County is not the exclusion of Dr. Cowan's testimony related to the existence of a segregated housing pattern in the Rural Area. (Doc. 41 at 4). In truth, the County seeks to bar *all* of Dr. Cowan's testimony as not relevant to the issue of causation. (Doc. 34).

[38] (Doc. 34-4 at 12).

163). Dr. Cowan agreed that he "is not trying to say that something is causing" there to be "different percentages" of races on each side. (*Id.* at 163). Dr. Cowan testified that he "never offered an opinion on causation and was never asked to do so." (*Id.* at 22).

The Court has reviewed Dr. Cowan's deposition (Doc. 34-5), his Declaration (Doc. 34-2, 36-4), the adopted Rural Boundary Initial Report for Seminole County (the unredacted "Initial Report"; Doc. 36-7 & 52-1), and his Rebuttal Report dated September 26, 2019 (Doc. 34-4) in order to determine whether his expert testimony meets the requirements set forth by *Daubert* and Rule 702 by a preponderance of the evidence. The Court addresses the Motion, taking up each argument in turn.

### A. Qualifications

Dr. Cowan is well-qualified as a statistician, and the County does not challenge his qualifications as a statistician generally. Instead, the County contends that Dr. Cowan's testimony is inadmissible expert testimony under Rule 702 because he has no knowledge or experience concerning the Seminole County policies that he has opined "perpetuate segregation." River Cross argues that it is not offering Dr. Cowan as an expert on the County's land use policies or entitlement process, but as

an expert in statistics to demonstrate with statistical analysis that a segregated

housing pattern exists in the Rural Area.[39]

In addition to other positions in federal government work and academia, Dr.

Cowan served as Chief Statistician for the Resolution Trust Corporation, then the

FDIC, as well as Director of Quantitative Methods for Pricewaterhouse Coopers

before starting his own firm; he has a Ph.D. in mathematical statistics. (Doc. 34-5 at

12, 14). He served for 12 years at the U.S. Bureau of the Census. (Doc. 34-4 at 4).

Dr. Cowan is qualified to testify as a statistician about his statistical analysis

regarding the differences in the housing patterns that exist in the Rural Area and the

Urban Area based on Census data (or equivalent well-accepted population

estimates).

As other courts have noted, accepting an expert's qualification to testify

competently does not guarantee that his testimony is admissible. *See Oliver v. City

of Orlando*, No. 6:06-cv-1671-Orl-28DAB, 2011 WL 2174010 (M.D. Fla. May 31,

2011), *aff'd*, F. App'x 815 (11th Cir. 2012). *Daubert* and Rule 702 require that courts

apply their gatekeeping function to each expert to determine if the testimony is

---

[39] To the extent that River Cross argues that Dr. Cowan is "qualified" to testify specifically that "the Rural Boundary Line is perpetuating that segregated housing pattern" (Doc. 41 at 9) or the cause of the differences in the housing patterns, that relates to methodology and is addressed below.

scientifically valid and whether the reasoning or methodology can be applied to the facts at issue. *Id.* (citing *Daubert*, 509 U.S. at 592).

**B.** *Methodology*

The County's arguments about Dr. Cowan's qualifications essentially overlap with its arguments criticizing his methodology and deductions. The County points to Dr. Cowan's opinions concluding that it is "not the [Boundary] line itself leading to segregation, but rather policies that are enforced differentially in the urban and rural divisions of the county [which] would continue the segregative effects." (Doc. 34-4 at 3). The County argues that this opinion is inadmissible "conjecture and speculation." The County further argues that Dr. Cowan cannot testify as an expert on whether the County's denial of the River Cross application to amend the Rural Boundary Line has a discriminatory effect perpetuating segregation because he has admitted that he does not know what the Seminole County policies are related to the Boundary Line and he has no knowledge or experience related to the entitlement process or land development. (Doc. 34-5 at 34, 37-38, 176). Given this admitted lack of expertise, to the extent Dr. Cowan attempts to offer an opinion regarding the effect of differing Seminole County policies on segregation in the community, the County argues, he should be excluded from testifying since he does not know what Seminole County's policies are. Additionally, the County points out that, although Dr. Cowan

asked for information from his client regarding the County's "economic" or "business" justifications for the County's actions, River Cross did not provide that information to him. (*Id.* at 185, 187).

The County also argues that Dr. Cowan's testimony should be excluded because the methodology he used has not been peer reviewed, published, tested or verified and his conclusions are not generally accepted in the relevant community. The County argues that, whether there are differences in the minority populations and the rate of change has no probative value without an analysis of *why* it occurred. Thus, the County contends, Dr. Cowan's testimony fails because the analysis of segregative effect requires a "causation" analysis that he did not perform as part of his statistical analysis and admission of his opinions would be highly prejudicial if he does not provide any substantive relevant information.

River Cross readily admits that Dr. Cowan is not qualified as an expert on land use policies. River Cross also concedes that Dr. Cowan does not intend to opine about the "causation" of the segregative effect. (Doc. 41 at 9). Rather, River Cross argues that Dr. Cowan's opinions, in the initial Report and his testimony, address only "the segregated housing pattern" existing in the County's Rural Area "through statistical analysis," which shows that fewer minorities lived in the Rural Area than in the Urban Area as of 2016. (*Id.* at 7 (citing Doc. 36-7 at 10 (T. 1), 17 (T. 3b)).

River Cross argues that it is only required to produce evidence of a segregated housing pattern—in this case, a statistical analysis of the Census Data demonstrating that fewer minorities live in the Rural Area relative to the Urban Area—which Dr. Cowan's Initial Report and testimony show. (Doc. 41 at 8). River Cross contends that it need *not* show evidence of "causation" of the segregative effect, only that a segregated housing pattern in the Rural Area exists because it is up to the trier of fact to determine whether the Boundary Line, or the County's denial of the River Cross application, or "some other factor perpetuates" the segregated housing pattern in the Rural Area. River Cross admits that Dr. Cowan "did not consider causation specifically" but argues that "his methodology still demonstrates a causal relationship between the Rural Boundary Line and the segregated housing pattern in the County's Rural Area."[40] (*Id.* at 10). River Cross explains that Dr. Cowan applied statistics, observed the results, and drew a conclusion that was reasonable, such that if the County wishes to discredit Dr. Cowan for not performing a "causation analysis," the County should address it on cross-examination. River Cross argues that the statistical analysis in both of Dr. Cowan's Reports comparing the

---

[40] Although River Cross relies on the differences of the racial composition of residents living within a one to five miles of the Boundary Line to argue there is a "segregative effect," Dr. Cowan testified that this data from Dr. Boone in the initial report did not have any impact on *his* opinion of segregative effect because he "believed that they are relatively small distances." (Doc. 34-5 at 122).

demographics and the different results demonstrate that there is a smaller population of minorities residing in the Rural Area, and diversity in the Rural Area has increased at a slower rate than in the Urban Area. (Doc. No. 36-7, at 10 (T. 1), 17 (T. 3b); Doc. No. 34-4 ¶¶ 10-18). Therefore, River Cross argues, Dr. Cowan's conclusion regarding the County's denial of its application and the Rural Boundary Line perpetuating segregation are not "impermissible leaps in logic."

However, in order to reach its conclusion that "the Rural Boundary Line is predictably reinforcing and/or perpetuating the segregated housing pattern existing in the County's Rural Area," River Cross erroneously argues that "the only meaningful difference between" the Rural and Urban Areas is "an arbitrary rural boundary line dividing the two areas, and allowing for development on one side and precluding development" on the other side. (Doc. 41 at 10). Despite River Cross' eponymous name, it ignores the fact that the significant and essential difference in the two areas in this case is the Econ River Basin, Econ River Wilderness Preserve, and the complete dearth of any existing or planned infrastructure, commercial development, transportation, and limited roads in the vast majority of the Rural Area, which distinguishes it greatly from the Urban Area and makes the two areas far from "interchangeable." Nearly two-thirds of the Rural Area is comprised of parks and conservation land (38%), agricultural and timber land (25%), and lake or swamp

land (3%).[41] The population in the Rural Area is only 2% of the County's total residents versus the 98% of County residents who live in the Urban Area. (*See* Doc. 35-15 at 10 (for 2018), Doc. 36-6 at 13).

Dr. Cowan's testimony and opinions do not address the central issue in the case, whether the Boundary Line and the denial of the River Cross application perpetuate or reinforce a segregative effect. Dr. Cowan admitted as to the census data that there was "a problem in allocation the block group population counts to rural and [urban] classes" because a good deal of the statistical evidence on which he relied from the Initial Report was based on seven of ten census block groups and five census "tracts," which, in the rural area, are "few and very large" so that they "will likely go over the boundary [line]" and encompass *both* the urban *and* rural areas. (Doc. 34-5 at 115). All of the census tracts were cut through by the Boundary Line. (*Id.*). Therefore, a representative percentage of minority and non-minority populations had to be "weighted" by the statistician and assigned to each side without specifically knowing the racial composition of the residents because the "Line" could go through the census block. (*Id.* at 118). He explained that "a particular area is designated as, let's say, 60 percent urban, 40 percent rural. . . .

---

[41] Three percent of the Rural Area also contained "municipal" land and "utilities" in addition to "lake/swamp." (Doc. 35-15 ¶ 22).

[T]hen you've got counts of numbers and people who are in this area *but you don't know which side [of the Boundary Line] they go on*. . . . So to allocate the counts of the numbers of people, you take 60 percent who would be in the east side and 40 percent who'd be on the west side -- that's the weighting [his employee, Dr. Boone is] talking about -- to get counts of the numbers of individuals in each of the different groupings we've been discussing." (*Id.* at 118). Dr. Cowan acknowledged that additional "variability" or error could be built into the distribution of race because of the "weighting" on either side of the Boundary Line across the precincts, but "one would think in general, it's unlikely and you hope it all washes out [on average]. . . since you are doing a lot of areas." (*Id.* at 119 (emphasis added)).

While Census data is typically acceptable in FHA cases, in this case the methodology Dr. Cowan used (or adopted from Dr. Boone) to determine "diversity" in the Rural Area is not reliable because it admittedly contained "variability" or error he "hope[d] washes out" in the end.

### C. *Assist the Trier of Fact*

The County argues Dr. Cowan's testimony will not assist the trier of fact in understanding the evidence or in determining the facts in issue because his offered opinions do not "fit" the case and should be excluded. (Doc. 34 at 16 (citing *Phillips v. Am. Honda Motor Co., Inc.*, 238 F. App'x 537, 540 n.2 (11th Cir. 2007) (finding

"when expert's data is not directly relevant to the matter at issue in a case, the expert's testimony does not assist the trier of fact and is therefore inadmissible under *Daubert*")). River Cross argues that Dr. Cowan's testimony will assist the trier of fact because his statistical analysis shows a segregated housing pattern existing in the County's Rural Area which is relevant to the case and will assist the trier of fact in determining the factual issues.

However, as the County points out, Dr. Cowan admits he is not offering an opinion regarding whether there is a "segregative effect" perpetuated by the Rural Boundary Line or denial of the River Cross application. Dr. Cowan testified that when he states that he sees a "segregative effect," he means he sees a "difference," but not anything that he can say was caused or perpetuated by the County:

> Q. And to be clear, you're not saying that any action or inaction of the county in this case has a segregative effect?
>
> A. What I'm saying is, is that I see a segregative effect, I don't know if actions by the County are causing it and that's as far as I can go.

(Doc. 34-5 at 164). Dr. Cowan also testified to "the relative diversity between the east and west sides [of the Boundary Line] and the pace at which they're diversifying." (*Id.* at 168-69).

The County argues that the only testimony required by an expert is whether there is a segregative effect caused or perpetuated by Seminole County's denial of

the River Cross application to rezone the property, thus, the disparities in Rural and Urban Area "diversity" that are the basis of Dr. Cowan's opinions have no relationship to the merits of this case because they could be explained by multiple other factors that he did not consider. Throughout his report, Dr. Cowan used the term "segregative effect," even though he was analyzing "diversity" and he admitted he did not analyze causation and perpetuation. (Doc. 34-5 at 29, 170). In addition, Dr. Cowan failed to perform any analysis regarding the demographics of people who would potentially live within the River Cross development. Therefore, the County argues that his testimony will be prejudicial and confusing to the trier of fact.

River Cross argues that Dr. Cowan's testimony is directly relevant to and "fits" the issues of this case. River Cross also contends that the distinction between "diversity" and "segregation" is one "without a difference" because his analysis of lack of diversity is directly relevant to whether "segregation" or what River Cross defines as "the systematic lack of diversity," has occurred. River Cross contends that Dr. Cowan need not analyze who would potentially live in the River Cross development because he can testify about the segregated housing pattern.

In *Inclusive Communities,* the Supreme Court held that a violation of the FHA may be based on a claim of discriminatory effect by applying the segregative effect theory; however, the claim cannot be "based solely on a showing of a statistical

disparity" and "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Inclusive Cmtys.*, 135 S.Ct. at 2523. Although River Cross argues that Dr. Cowan's testimony of differing levels of "diversity" in the Urban and Rural Areas supports "segregative effect," his analysis is just a "showing of statistical disparity" and is not evidence of a "systematic" effort to exclude minorities through zoning decisions such as has been discussed in other segregative effects cases. *See, e.g., Huntington*, 488 U.S. at 16–18, 109 S.Ct. 276; *Black Jack*, 508 F.2d at 1182–1188 (cited with approval in *Inclusive Cmtys.*). Additionally, it is undisputed that Dr. Cowan did not perform any analysis regarding the demographics of residents who would potentially live within the River Cross development, and without such demographic evidence that *any* minorities would reside in the development, River Cross cannot argue that the County's denial of the its application perpetuates segregation.

Dr. Cowan's testimony and opinions about the "segregative effect" will not assist the trier of fact and will be excluded.

## V.    ANALYSIS OF THE SEGREGATIVE EFFECT CLAIM

### A.  Perpetuates or Reinforces Segregation

The County argues that, based upon the 2013 HUD Regulation, all discriminatory-effect claims require causation. *See* 24 C.F.R. § 100.500(c)(1)

(requiring that a "challenged practice caused or predictably will cause a discriminatory effect"). The County argues that even though *Inclusive Communities* focused on disparate impact claims, the opinion clearly detailed the limits the Supreme Court believes must be placed on the FHA, and the "robust causality" requirement ensures that racial imbalance alone does not, without more, establish a prima facie case of discriminatory effect and "thus protects defendants from being held liable for racial disparities they did not create." *Id.* at 2523. Therefore, the County argues, a plaintiff's failure to produce statistical evidence demonstrating a "causal connection" is fatal to a prima facie case. (Doc. 35 at 19). River Cross argues that it does not need to show any causation in this case, only that the Boundary Line "reinforces" or "perpetuates" segregation.

The Supreme Court's admonition regarding the adequate safeguards that must be in place to prevent zoning bodies from abandoning legitimate objectives for fear of litigation is instructive. The thrust of the Supreme Court's *Inclusive Communities* decision is that a violation of the FHA may be based on a claim of discriminatory effect; however, it cannot be "based solely on a showing of a statistical disparity" and "must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity," which, in the context of disparate impact, requires a "robust causality requirement." *Inclusive Cmtys.*, 135 S.Ct. at 2523. In the context of segregative

effect claims, the leading circuit court cases have found the action or decision must "significantly" perpetuate segregation. *See Huntington*, 844 F.2d at 937-38 (holding restriction of low-income multifamily housing to a minority area and its refusal to allow the proposed project in a 99%-white area *significantly* perpetuated segregation); *Arlington Heights*, 558 F.2d at 1291 (holding that the construction of the housing would be a significant step toward integrating the community where "[t]he Village remains overwhelmingly white at the present time"); *see also Davis v. New York City Hous. Auth*., 166 F.3d 432, 438 (2d Cir. 1999) (holding that the "proper standard to be applied" on remand was whether the proposed use of a preference for working families in city's subsidized housing would "*significantly* perpetuate segregation" where district court had found a history of past segregation existed) (citing *Huntington,* 844 F.2d at 938)); Schwemm, *supra*, at 728-29 ("As with the principles discussed" in *Inclusive Communities* regarding disparate impact, "these 'cautionary standards' for FHA-impact claims might reflect more broadly the Court's concerns with non-intent claims under the FHA and thus apply as well to the segregative-effect theory of liability.").

"To make a case for segregative effect, the plaintiff must have a [] thoroughly developed record that shows such indicia of segregation as localized concentrations of minority groups within the municipality; comparisons of the racial composition

of the areas inside and outside the municipality, showing that minority groups have been excluded from the municipality; and historical practices of segregation, the effects of which linger in the present." *Housing Inv., Inc. v. City   of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999) (citing *Huntington v. Huntington Branch NAACP*, 488 U.S. 15, 109 S.Ct. 276, 102 L.Ed.2d 180 (1988) (noting that most of the black residents of the town, who comprised 4% of its population, lived clustered in six census tracts, and three quarters of the remaining census tracts, like the prospective site for low-income housing development, were 99% white)). Without such a showing of historical practices of segregation or a localized concentration, "[t]he statistic that the population . . . . is 80.5% white and 19.5% nonwhite only repeats the otherwise unsurprising fact that racial minorities are minorities. Without more, this observation does little to support the claim of a segregative effect." *Housing Inv., Inc. v. City of Clanton*, 68 F. Supp. 2d 1287, 1299 (M.D. Ala. 1999).

Even if the Court were to consider the expert opinion of Dr. Cowan, River Cross would not state a prima facie case because River Cross does not attempt to make a showing of "historical practices of segregation" or comparisons of racial composition showing intentional exclusions or that the County's "challenged practice caused this segregative effect."[42]  The 2013 HUD regulation authorizes such

---

[42] Schwemm, *supra*, at 712 & n.16.

a segregative effect claim when a challenged practice "perpetuates" or "reinforces" segregated housing patterns. The definition of "perpetuate" is to "cause to last indefinitely." *Id.* https://merriam-webster.com (visited on May 24, 2021). Similarly, the meaning of "reinforce" is "to make stronger or more pronounced." *Id.* Inclusion of these verbs in the 2013 HUD Regulation denotes an increase or strengthening of segregation in order to establish liability for a segregative effect violation.

Dr. Cowan specifically does not contend that the Boundary Line "caused" the segregative effect in the Rural Area, and he concedes that "diversity" or integration has increased in the Rural Area. The only evidence River Cross can point to is the Census data that River Cross admits shows that the Rural Area is *integrating* and becoming more diverse, albeit at a slower rate than the Urban Area, which contains 98% of the County's population.

Based on the 2010 Census data, Seminole County as a whole was 78% white and, thus, 22% non-white.[43] In comparison, the Rural Area—with only two percent

---

[43] The 2000 and 2010 Census figures are utilized in the Fishkind Report. (Doc. 35-15 at 10). Fishkind used (un-weighted) Census data "at the census tract level for the rural areas of the County. While the rural census tracts do not exactly match the County's rural areas, they produce the best approximation for the County's rural area." (*Id.* ¶ 31). Since River Cross has failed to define any protected group or specific minority group for comparison (*see* Initial Report, Doc. 52-1), and most segregative effect cases describe the comparison as between the percentage of white residents and non-white residents described as Black or African American, as in *Black Jack* or *Arlington Heights*, or Hispanic, as in *City of Yuma*, the Court's comparison will look at white (alone) residents and "non-white" residents of all ethnic or racial descriptions. The percentages of different racial groups as provided by the experts do not add up to 100% because the category of "Hispanic or Latino Origin" is for residents "of any race" according to census data and individuals

of the County's population—in 2010 was 90% white and 10% non-white.[44] Eight years later at the time River Cross filed this lawsuit, based on 2018 ESRI figures, both Seminole County as a whole and the Rural Area had become less segregated and more integrated since 2000 (before implementation of the Boundary Line). The percentage of white residents in Seminole County overall has fallen to 75%, even as the overall population is estimated to have increased to 464,616 in 2018. (Doc. 35-15 at 10). The Rural Area has also become more integrated as the percentage of white residents in the Rural Area has decreased to 87% and the percentage of non-white residents has increased to 13% despite implementation of the Boundary Line in 2004. (*Id.*).[45]

Because the Rural Area has diversified at a slower rate than the County overall, Dr. Cowan opines that the "formalization" of the Boundary Line "perpetuates a segregative effect." The basis for Dr. Cowan's opinion is that "[t]he diversity in the rural areas has taken place at a much slower rate than in the urban areas, causing the difference in terms of diversity to widen over time." (*Id.* ¶ 16).

---

of "two or more races" fit into overlapping categories. *See* http://www.census.gov/quickfacts.

[44] According to the Fishkind Report, based on the 2010 census data: 10,082 white residents comprised 89.7% of the Rural population. *See* Doc. 35-15 at 10.

[45] The Fishkind Report cites data from the 2018 Estimate from Environmental Systems Research Institute ("ESRI") which shows (based on geographic information system mapping and data analytics measuring the racial/ethnic composition of the population): Within the Rural Service Area of the County, 10,560 white residents comprised 87.4% of the Rural Area population, thus, 100% of the overall population for the area is 12,082. (Doc. 35-15 at 10).

But "both communities became more diverse over time," although "the urban areas of Seminole County experienced significant positive population growth over the past decades. The rural areas experienced negative growth." He concludes that "having a residence in the rural area became less feasible than having a residence in the urban area due to limits on land use and reduction[46] in the availability of certain urban services." (*Id.* ¶ 18). "By comparing these percentage drops [in livability], I find that minorities were less likely to live in the rural areas in 2010." (*Id.* ¶ 21). However, as Dr. Cowan acknowledges, white residents were also less likely to live in the Rural Area. "[F]rom year 2000 to 2010, the total population in the urban areas grew by 22% while the population in the rural areas dropped by 11.5%." (*Id.* at 9 (T. 3)).

According to Dr. Fishkind's Report based on Census data, from 2000 to 2018, "the absolute level of white population in the Rural Area declined from 11,822 in 2000 to 10,560 by 2018. By contrast, the black population increased from 444 in 2000 to 550 by 2018." (Doc. 35-15 ¶ 36 (Fishkind)). The Fishkind Report shows that the trend is also true for other minority groups, in that the Asian and Hispanic populations nearly doubled from (collectively) from 875 in 2000 to 1,561 in 2018,

---

[46] There is no evidence of a "reduction" in available services and Dr. Cowan's basis for this opinion is not explained in his Rebuttal Report. (Doc. 34-4).

even while the total population in the Rural Area was falling from 12,794 in 2000 to 12,082 in 2018. (*Id.* at 10).

Because it is undisputed that the Rural Area has become more diverse albeit more slowly than the substantially more populated Urban Area, River Cross cannot show the County's enforcement of the Boundary Line or denial of its application "perpetuates" or "reinforces" segregation. *See, e.g., Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 494-96 (9th Cir. 2016) (affirming summary judgment on segregative-effect claim brought by developer for city's denial of proposal in southeastern area of city (where white population had fallen from 75% in 1990 to 65% in 2010, near the time of the rezoning which showed that Hispanics were integrating into the area[47])); *In re Malone*, 592 F. Supp. 1135, 1167 (E.D. Mo. 1984) (rejecting segregative-effect claim because plaintiff's blocked development would have only a de minimis impact on segregated housing patterns in the area), *aff'd sub nom. Malone v. City of Fenton*, 794 F.2d 680 (8th Cir. 1986) (table). Without evidence of the County's "perpetuation" or "reinforcement" of segregative effect, River Cross cannot state a prima facie case and the County is entitled to summary judgment on the FHA segregative effect claim on this basis alone.

---

[47] The relevant facts are in the district court decision, No. 2:09-cv-00297 JWS, 2013 WL 2455928, at *7 (D. Ariz. June 5, 2013), *rev'd on other grounds*, *Avenue 6E Investments, LLC v. City of Yuma*, 818 F.3d 493, 494-96 (9th Cir. 2016).

However, for the sake of completion of the discriminatory effect analysis, *see Inclusive Communities*, the Court will proceed to Steps 2 and 3 in the burden-shifting analysis to consider the County's legitimate, non-discriminatory reasons for denying the River Cross application and whether River Cross has asserted any alternative less discriminatory.

### B. *The County's Legitimate, Nondiscriminatory Justification*

Assuming *arguendo* River Cross had been able to prove a prima facie case of segregative effect, the burden would then shift to the County to prove that its "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." 24 C.F.R. § 100.500(c) (2013 HUD Reg.). The County argues it had legitimate, non-discriminatory[48] reasons to deny the River Cross application to amend the Boundary Line, Future Land Use Map, and rezoning based on Seminole County's desire to avoid "urban sprawl." (Doc. 43). As the County staff identified, there were a significant number of issues with conversion of the rural-

---

[48] River Cross does not suggest, nor would it be appropriate to suggest under the facts of this case in which the County's planning process was driven by state statute requiring extensive community planning, that the County's use of the term "urban sprawl" was nothing more than "coded" language for intentional discrimination against minorities. *Compare CWK Invs.-Hillsdale, LLC v. Town of Darmstadt*, No. 3:17-CV-00133, 2018 WL 10322077, at *8 (S.D. Ind. Sept. 13, 2018) (comments by residents of 97%-white town relating to the "urban sprawl of Detroit," the "crime rates," and suggestions that the development's potential residents "could live downtown" in a nearby city constituted circumstantial evidence of racial animus). Moreover, River Cross did not present any evidence to contradict Ms. Frederick's explanation that Seminole County had supported the building of more than 5,000 affordable housing units and that number did not include the "home ownership" efforts of the County.

agricultural land to the proposed commercial and dense residential development: the lack of required central water and sewer services to the agricultural land, substantial obstacles to crossing the Econlockhatchee River (and other natural resources protection areas); lack of existing transportation and explanation of plans to fund road expansion and improvements; the lack of transitions or buffer areas around the development; and the incompatibility of the project with surrounding agricultural and rural areas.

Thirty six years ago, the state of Florida began requiring its counties to create comprehensive plans and future land use maps that would avoid "urban sprawl." Seminole County, as of 1991, first decided to create a boundary to promote urban growth on the western side of the Econ River and concentrate the parks, conservation, agricultural, and undeveloped land on the eastern side of the Econ River where, even as of 2018, only 2% of the County's population resided despite comprising approximately one-third of the land in the County. Following the well-litigated dispute with a municipality within the County over the annexation and development of land in the rural section of the County,[49] the voters of the County passed a Charter Amendment to solidify the County's preemptive authority to decide

---

[49] *See Seminole County v. City of Winter Springs*, 935 So.2d 521, 523-24 (Fla. 5th DCA 2006).

which projects would be developed on the eastern side of the Boundary Line; there would be no future high-density development in the rural area until the vacant land in the urban area was depleted.

A Florida county's denial of a rezoning application to protect the area from "suburban and urban sprawl," has been held by the Eleventh Circuit to be "without question" a "legitimate government goal." *Dibbs v. Hillsborough Cty., Fla*., 625 F. App'x 515, 517 (11th Cir. 2015) (affirming grant of summary judgment to county on developer's due process claim because "[i]t is well settled that the maintenance of community aesthetics is a legitimate government purpose"). The county in *Dibbs* was justified in its decision to reject the developer's application to rezone the property and enforce its community plan in order to preserve natural areas and resources, maintain ecological balance, and improve design aesthetics. *Id.* Other courts have also held that the preservation of scenic and recreational areas is a legitimate reason to deny rezoning in the context of equal protection challenges to zoning restrictions. *See, e.g., Gypsum Res., LLC v. Masto*, 672 F. Supp. 2d 1127, 1142 (D. Nev. 2009) (holding that state interest in "preserving scenic views and rural character" of Red Rock Canyon was a legitimate governmental purpose) (citing *S. County Sand & Gravel Co. v. Town of S. Kingstown*, 160 F.3d 834, 836–37 (1st Cir. 1998); *Ybarra v. Town of Los Altos Hills*, 503 F.2d 250, 254 (9th Cir. 1974)

(preservation of a rural environment)). Moreover, River Cross concedes that Seminole County has a legitimate interest in limiting urban sprawl. (Doc. 35-3 at 253).

The Supreme Court's cautionary statement in *Inclusive Communities,* is especially apt in this case: "Zoning officials . . . must often make decisions based on a mix of factors, both objective (such as cost and traffic patterns) and, at least to some extent, subjective (such as preserving historic architecture). These factors contribute to a community's quality of life." *Id.* at 2523. In this case, in an effort to avoid "urban sprawl," the County has made the legitimate, non-discriminatory decision, consistent with the Florida growth management statutes, to concentrate higher-intensity residential and commercial developments on the western side of the Econ River where the infrastructure, transportation, and jobs support more intense growth. The County's decision is reflected in the design of the County's state-approved Comprehensive Plan, and its related Future Land Use Map. Other counties in the state—including Orange, Osceola, Brevard, Lake, Polk, Flagler, Hillsborough, and Marion—have also used the urban service area designation for capital planning, infrastructure (transportation and utilities) and environmental purposes. (*See* Doc. 35-15 ¶ 27). River Cross has failed to raise a genuine issue of material fact as to the County's legitimate non-discriminatory reason for denial of the River Cross

application and enforcement of the Boundary Line. Therefore, the County is entitled to summary judgment.

The County having stated legitimate, nondiscriminatory reasons for denial of the River Cross application, in order to survive summary judgment, River Cross would have the burden to prove that the County's interest in "the challenged practice could be served by another practice that has a less discriminatory effect." 24 C.F.R. § 100.500 (2013 HUD Reg.). Despite the County having specifically raised this issue (Docs. 35, 43), River Cross has not alleged *any* alternative with a "less discriminatory" effect. (Docs. 42, 45).

Accordingly, the County is entitled to summary judgment on River Cross' Fair Housing Act segregative effect claim.

## VI.   CONCLUSION

As an initial matter, River Cross does not have standing to pursue a Fair Housing Act claim. As a non-minority developer pursuing a commercial venture, without any evidence that minority residents would live in the proposed development, or that the state agency would approve affordable housing where no transportation at the site exists, River Cross cannot pursue a discriminatory effect claim under the FHA.

Even if River Cross had standing in this FHA case, it fails to state a prima facie case because it lacks statistical evidence that the County's enforcement of the Boundary Line or its denial of the River Cross application "perpetuates" or "reinforces" a segregative effect on minority groups. Dr. Cowan, the expert for River Cross, admits that he cannot provide an opinion on causation, and his methodology using the "weighting" of minority representation within the census tracts divided by the Boundary Line lacks reliability. Therefore, his testimony will not assist the trier of fact and will be excluded. Moreover, it is undisputed that the Rural Area of the County is becoming more integrated—not less—even as its population is shrinking.

Assuming *arguendo* River Cross had established a prima facie case of segregative effect, it has failed to challenge the County's legitimate, non-discriminatory reason for enforcing the Boundary Line. River Cross does not dispute that the County has a legitimate interest in avoiding "urban sprawl," or that County's zoning decisions must be consistent with the comprehensive plan and future land use map it developed pursuant to Florida's community planning laws. River Cross has also failed to show that the County could have met Florida's goal to avoid "urban sprawl" through a "less discriminatory" means.

Based on the foregoing, it is ordered as follows:

1. Seminole County's Motion to Exclude the Opinions and Expert Testimony of Dr. Charles Cowan (Doc. 34) is **GRANTED**.

2. Seminole County's Motion for Summary Judgment (Doc. 35) is **GRANTED**.

3. Plaintiff River Cross Land Company, LLC's Motion for Partial Summary Judgment (Doc. 36) is **DENIED**.

4. Seminole County's Motion in Limine (Doc. 44) is **DENIED as moot**.

5. The Clerk is directed to enter judgment that Plaintiff River Cross Land Company, LLC take nothing on its claims, and Defendant Seminole County is entitled to costs.

6. The Clerk is directed to close the case.

**DONE** and **ORDERED** in Chambers, in Orlando, Florida on June 4, 2021.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record